William McQUEEN and Patricia
McQueen

v.

Bertram **DRUKER** and Representatives
of the late Joseph Gottlieb d/b/a
Castle Square Associates.

Civ. A. No. 70–1082.

United States District Court,
D. Massachusetts.

Oct. 5, 1970.

Michael L. Altman, Michael Unger, Brian Michael Olmstead, Boston Legal Assistance Project, Dorchester, Mass., for William McQueen and Patricia Mc-Queen.

Robert J. Sherer, Roche, Carens & De-Giacomo, Boston, Mass., for Bertram Druker and Joseph Gottlieb d/b/a Castle Square Associates.

## OPINION

WYZANSKI, Chief Judge.

### Introduction

This is an action for an injunction, for a declaratory judgment, and for damages. Plaintiffs are tenants threatened with eviction from a housing project. The originally named defendants, Druker and Gottlieb, were two private persons who as landlords of the project had been financially assisted by the federal government under § 221(d) (3) of the National Housing Act and by the state government in other ways. Gottlieb died October 4, 1970. For convenience, reference will be made to him instead of to his representatives. Count 1 alleges that defendants' threatened use of state eviction proceedings violates plaintiffs' rights under the due process clauses of the Fifth and Fourteenth Amendments inasmuch as defendants failed to give them notice of good cause (other than the expiration of their lease) for evicting them and have not afforded them a hearing. Count 2 alleges that defendants' threatened use of state eviction proceedings violates plaintiffs' rights under the First Amendment inasmuch as defendants are motivated by retaliation for plaintiffs' exercise of their rights of association with other tenants in presenting grievances to defendants, to the FHA, and to the courts.

Jurisdiction is predicated chiefly upon 28 U.S.C. § 1343(3).

### Findings of Fact

1. Defendants, Druker and Gottlieb, doing business as Castle Square Associates Company, own the Castle Square project. They are referred to as § 221 (d) (3) landlords because they have borrowed money on a mortgage note pursuant to § 221(d) (3) of the National Housing Act, as amended, 75 Stat. 149, 150, and are subject to the regulatory agreement referred to in Hahn v. Gottlieb (1st Cir.), 430 F.2d 1243, Aug. 14, 1970.

2. Boston Redevelopment Authority, an agency of the Commonwealth of Massachusetts, acquired, by eminent domain proceedings, from private owners the land on which the Castle Square project stands. It deeded to City Redevelopment Corporation, a private corporation, which Druker and Gottlieb were interested in, the land, subject to a "Land Disposition Agreement". Both that agreement and the covenants in the deed provided that the land could be used only for the execution of the Boston South End Urban Renewal Project and for the development of a housing project which complied with specified restrictions. For example, the landlord must give preference to tenants displaced by redevelopment activity, [Ex. 1, Sec. 301(a) (3)] must not "discriminate upon the basis of race, creed, color, or national origin" in the lease of property, [Ex. 1, Sec. 301(a) (4)] and must consult wtih the Boston Redevelopment Authority "with respect to its rental

program * * * and all aspects of the rental program which relate to or have an effect upon the selection of tenants." [Ex. 1, Sec. 301(e)] City Redevelopment Corporation deeded the land, subject to the aforesaid restrictions, to defendants, who expressly assumed their transferor's obligations. Thereafter defendants executed a § 221(d) (3) mortgage.

3. The City of Boston agreed that, in view of the purposes of the project, the owners of Castle Square should be taxed, instead of on the basis of the assessed value of the property, at the special rate of 15% of gross income, a rate far lower than the prevailing rate in Boston.

4. Castle Square is managed by a project director, Edwin D. Abrams. [Stip. 1, par. 4] Although he is not an employee of defendants but of Castle Square Associates Management Co., it is undisputed that Abrams has authority to act for defendants with respect to Castle Square tenants, leases, rentals, and evictions.

5. Plaintiffs, William McQueen and his wife, Patricia, are tenants of apartment 6–D, Emerald Court, Boston, one of 500 apartment units in a housing project called Castle Square. They had been previously displaced by urban renewal and were entitled to the priority provided by 24 C.F.R. § 221.537(c) and by defendants' obligations to Boston Redevelopment Authority already mentioned. The McQueens entered upon their occupancy on February 9, 1967 pursuant to a written lease which expired on July 31, 1967, but which is automatically renewable for successive one year terms "unless either Landlord or Tenant, at least sixty (60) days prior to the end of the then current term, shall notify the other party, in writing, that it elects to terminate this Lease at the end of the then current term."

6. May 29, 1970 Abrams in his capacity as project director notified the McQueens that:

"In as much as you claim to be tenants under a lease dated February 9, 1967, * * * Castle Square Associ-

ates Co. elects to terminate said lease at the expiration of the current term July 31, 1970. You are ordered to vacate the premises presently occupied by you at 6–D Emerald Court at the expiration of said term * * *" [Stip. 1, Ex. A]

That reference to the expiration of the lease as the cause for the termination of the lease and order to vacate "is the only notice provided by defendants to plaintiffs with respect to the termination of the lease on July 31, 1970." [Stip. 1, par. 8]

7. Plaintiffs filed their complaint in this court August 28, 1970. August 31, 1970 defendants served upon plaintiffs a summary process writ for eviction pursuant to Mass.G.L. c. 239, returnable in the Boston Municipal Court September 7, 1970. In the state court defendants "intended to rely on the established State law that a tenant who holds over after the expiration of a lease may be evicted without cause." [Stip. 1, par. 11] "By agreement of the parties, summary process action in the Boston Municipal Court will not be marked for hearing until the present action is heard and determined by the Federal Courts." [Stip. 1, par. 12]

8. Although in his notice of May 29, 1970 to plaintiffs, Abrams referred only to the expiration of their lease, Abrams and defendants had other and more controlling causes for seeking to evict the McQueens. Indeed, this is plain from Abrams' action in sending on May 19, 1970 to each of the tenants at Castle Square a mimeographed statement of "Management's Reasons For Eviction of the McQueen Family". [Ex. A] This recites five reasons: (1) litigation caused by the McQueen's failure on several occasions during the last four years to make rental payments, (2) their defaults in maintenance of their apartment which required excessive repairs, (3) their failure to abide by regulations with respect to washing machines, which led to court proceedings, (4) the conviction of Mr. McQueen for an assault on one of Castle Square's employees, and (5) the McQueen's attitude. This last

reason is set forth in the following words:

"From Management's viewpoint, taking all the above circumstances into account, and the many confrontations which Management has had with the McQueen's it does not seem reasonable from Management's point of view that this family should continue to live in Castle Square."

9. There was a basis in fact for each of the five reasons which Abrams mentioned in his circular. The landlords of Castle Square had brought unsuccessful eviction suits, beginning in 1967, in the state courts against the McQueens for non-payment of rent; they had brought an unsuccessful eviction suit in 1969 against the McQueens for using a washing machine in violation of their lease; on the complaint of Allen, the superintendent of Castle Square, the Municipal Court of the City of Boston in January 1970 had adjudged Mr. McQueen guilty of an assault upon him; and in the McQueen apartment someone had stopped up the bathroom trap with a child's wooden bowling pin, and because Mrs. McQueen was unwilling to admit the plumber on his first trip, the plumber had to make and charge for two calls.

10. Most important, is the fact that Abrams' citation of "the many confrontations which Management has had with the McQueens" would be understood by the average tenant as referring not merely to McQueen's failures to pay rent, remove a washing machine, and other personal quarrels, but to his widely known activities in organizing and presenting tenants' claims to the landlords, to administrative agencies, and to courts. McQueen was one of the most prominent leaders of the tenants' group called The Castle Square Neighborhood Association. He was active in the tenants' paper called The Common Bond which was constantly critical of Abrams and of the management of Castle Square; was an organizer of demonstrations against the landlords; and was a party in Hahn v. Gottlieb (the recent federal litigation seeking to keep down the rental increases at Castle Square and to reform the leases) and in the FHA proceedings related thereto, as well as in other contentious matters involving tenants' alleged grievances. Mrs. McQueen was also involved, though not in a leadership capacity, with the tenants' group.

11. Although there was a basis in fact for each of the reasons Abrams gave on May 19 for eviction, those reasons were not of equal importance in motivating the eviction. On August 25, 1970 McQueen's counsel, Altman, sought to persuade Abrams to withdraw his eviction notice. Abrams admitted on the stand that, although incomplete, the following statement of Altman was correct.

"On the same date, August 25, 1970, I spoke with Mr. Edwin P. Abrams, Manager of Castle Square. I asked him whether there was any basis upon which plaintiffs and defendants could make peace so that we could avoid continually litigating the plaintiffs' right to reside at Castle Square. Mr. Abrams stated that we could not make peace on any terms. He stated that the eviction of the plaintiffs had become a 'cause celebre'; that Bertram Druker could not tolerate being 'confronted'; that he wanted plaintiffs out of Castle Square and would spend whatever was required to accomplish that result."

12. In rebuttal, defendants proved that they had not asked or required any other leader of, or participant in, the activities of the tenants' group to leave the Castle Square project.

13. In appraising this evidence, this court recognizes that there may have been many legitimate reasons why a landlord might wish to have the McQueens leave. For example, his assault on the superintendent in January might have been a sufficient ground for not extending a tenancy. But Abrams in his colloquy with plaintiffs' counsel in advance of this litigation virtually admitted that the controlling reason for his refusal to withdraw the notice to the McQueens to quit was that he thought

Druker could not stand confrontations by Mr. McQueen. While Abrams could not testify as to Druker's motives, he could testify as to his own motive for refusing to withdraw his notice to quit, and that motive is indicative of what was his motive for originally giving that notice.

 14. The court finds that it was chiefly because Abrams believed that Druker wished to retaliate for Mr. McQueen's confrontations on behalf of the tenants as a group that Abrams gave him the notice to quit. The fact that other equally active representatives of tenants did not have their tenancies terminated is unimportant. For here Abrams acted on his, perhaps erroneous, understanding of Druker's wish to get rid of McQueen personally because of *his* activities for the tenant association, *his* petitions to FHA and the courts for redress of grievances, and *his* defense of eviction suits in the state courts.

*Conclusions of Law*

In the interests of clarity, issues of jurisdiction will be postponed until after the substantive issues are reviewed. The substantive issues will be taken in the order set forth in the pleadings: first, the claim in count 1 that plaintiffs are entitled under the due process clauses of the Fifth and Fourteenth Amendments to notice of the cause (other than expiration of the lease) for their eviction and to a hearing thereon, and second, the claim in count 2 that under the First Amendment plaintiffs are entitled to protection against an eviction based on their associational activities on behalf of their fellow tenants. This court must face both sets of substantive issues because the relief sought includes prayers for declaratory judgments.

*1. Applicability of the due process clauses and of the First Amendment to defendants as landlords of Castle Square*

 The due process clauses and the inhibitions of the First Amendment not being applicable to purely private persons in their ordinary activities, the first issue is whether in evicting tenants, a § 221(d) (3) landlord financially assisted and partly controlled by the state as well as the national government, is subject to those amendments.

The case nearest in point is Colon v. Tompkins Square Neighbors, 294 F. Supp. 134 (S.D.N.Y.), cited with approval in Hahn v. Gottlieb (1st Cir.), 430 F. 2d 1243, August 14, 1970, at p. 1250. Applicants seeking to occupy a project exactly like Castle Square in its relation to federal and state financing complained that they had been denied admission by procedures lacking due process and on the basis of their status as welfare recipients. The defendant landlord moved to dismiss the complaint because there was missing the element of governmental action necessary to make the due process and equal protection clauses applicable. The court denied the motion on the following ground, stated at p. 137:

"The fact that Haven Plaza Apartments has been constructed on a designated urban renewal site, is financed by an FHA-insured mortgage, that the managing corporation, Tompkins Square, is the recipient of certain tax exemptions granted by the City as well as certain rent supplement subsidies and other forms of financial assistance from City, State and Federal authorities (Dano Affid. of April 9, 1968 at 2), and that the daily operations are ultimately supervised by both the New York City Housing and Development Administration and the Federal Housing Administration (hereinafter referred to as the 'FHA'), pursuant to Tompkins Square's Disposition Agreement with the City of New York and Regulatory Agreement with the FHA (id. at 3), indicates that there exists sufficient and continuing government participation and involvement in the project so as to bring any discriminatory operational practices within the gambit of constitutional prohibition. Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 724, 81 S.Ct. 856, 6 L.Ed.2d 45 (1960);

Cooper v. Aaron, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Hawkins v. North Carolina Dental Soc'y, 355 F.2d 718, 722–723 (4th Cir. 1966); Smith v. Holiday Inns of America, Inc., 336 F.2d 630, 634, 635 (6th Cir. 1964); Ethridge v. Rhodes, 268 F. Supp. 83, 87 (S.D.Ohio 1967)."

In the passage quoted, Judge Tenney was fully justified in his reliance upon Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. There the purely private Eagle Coffee Shoppe, Inc., a lessee in a publicly owned and operated automobile parking building, refused to serve Burton solely because he was a Negro. The Supreme Court held that the "exclusion of appellant under the circumstances shown to be present here was discriminatory state action in violation of the Equal Protection Clause of the Fourteenth Amendment" (p. 717, 81 S.Ct. p. 858). Mr. Justice Clark further stated: "By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." (p. 725, 81 S.Ct. p. 862)

■ The foregoing reasoning, as well as that in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, requires this court to conclude that the due process clauses of the Fifth and Fourteenth Amendment and the First Amendment are applicable to defendants. With respect to Castle Square, the federal and state governments have elected to place their power, property, and privilege behind the landlords' authority over the tenants, and have insinuated themselves into a position of interdependence with the landlords. Whatever may be the situation of the landlords of Castle Square with respect to their labor relations or to any immunity from intergovernmental taxation, their actions in relation to their tenants cannot be considered to be so private as to fall without the scope of the First, Fifth and Fourteenth Amendments. See *contra* Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, 87 N.E.2d 541. Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 30, note 108.

*2. Notice and Opportunity to be Heard*

The next issue is whether defendants may evict plaintiffs without giving them a notice based on some ground (other than the expiration of their lease) which constitutes good cause, and a hearing thereon before an impartial referee who will make his determination upon evidence openly submitted and cross-examined by the parties.

■ Procedural rights to notice and opportunity to be heard are dependent upon a preliminary consideration of substantive law. As the Supreme Court said in Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, and repeated in Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed. 2d 287 "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as the private interest that has been affected by governmental action."

Here the first question is what must the § 221(d) (3) landlord state in his notice to the tenant to quit. This is a question of substantive law not of constitutional law. The Constitution permits the federal government as landlord to lease the usual type of premises for a limited period, and to recover the premises by giving an abbreviated notice that the stipulated period has expired. United States v. Blumenthal, 315 F.2d 351 (3rd Cir.). So far as concerns the Constitution, the government may be as un-

informative in telling a tenant to quit as in telling an employee to quit. Cf. Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230. But just as statutes give a government employee a right to remain in certain kinds of employment until there is cause to discharge him, so a statute expressly or impliedly may give a government tenant a right to remain in certain kinds of occupancy until there is cause to evict. It is all a question of what a statutory scheme for governmental housing provides specifically or by implication. If the scheme contemplates that the tenant may remain until there is cause to evict him then the governmental landlord must give a good-cause notice.

There has been a growing recognition that when the federal or state government or both adopt a statutory scheme of low- and middle-income housing the governmental landlord and the tenants are in a posture quite different not only from the usual case of a private landlord and a private tenant, but also from a governmental landlord and an ordinary residential tenant. In the public housing field the recent tendency has been to require the governmental landlord to have a cause to evict and to give the tenant notice of that cause. Vinson v. Greenburgh Housing Authority, 29 A.D.2d 338, 288 N.Y.S.2d 159; Escalera v. New York City Housing Authority, 425 F.2d 853 (2nd Cir.) (semble); [1] But see Brand v. Chicago Housing Authority, 120 F.2d 786 (7th Cir.); Chicago Housing Authority v. Stewart, 40 Ill.2d 23, 237 N.E.2d 463; Housing Authority of City of Pittsburgh v. Turner, 201 Pa. Super. 62, 191 A.2d 869.

Reasons for holding that as landlord of a public housing project the government must give a notice of eviction based on something beyond the mere expiration of the term originally fixed are well summarized in Note, Public Landlords and Private Tenants: The Evictions of 'Undesirables' from Public Housing Projects, 77 Yale L.J. 988. As this note indicates, the general goal of both national and state housing programs is to provide for necessitous persons a decent home and a suitable living

[1]. In Escalera v. New York City Housing Authority, 425 F.2d 853 (2nd Cir.), a governmental housing authority refused to renew the expired monthly leases of three so-called undesirable tenants and ordered them to quit at the end of their monthly terms. In terminating the tenancies, or, more accurately, in refusing automatic renewals, the housing authority followed procedures which gave only a one-sentence summary notice of the grounds for termination, denied the tenants full access to the evidence relied upon, denied the tenants opportunity to confront and examine persons whose evidence was relied upon, and permitted final determination by an administrative tribunal, the Tenant Review Board (TRB), that did not state the grounds upon which it ordered eviction. (pp. 857–859) The tenants sued to enjoin the authority from evicting them because they had not been given due process of law. The District Court dismissed the complaint for failure to state a cause of action. The Court of Appeals reversed on the narrow ground that a trial was indispensable in order to determine what procedural steps in that situation were necessary to satisfy the due process clause.

(pp. 861, 867) But the court said that the "procedure *may* be deficient in four respects. First, summary notice such as that sent to the tenants here of the non-desirable conduct under consideration by the TRB is *inadequate*." (p. 862, emphasis added) That dictum may mean merely that if a governmental housing authority purports to limit its right to refuse a new lease to a situation where a tenant is undesirable then the authority must spell out the charge of undesirability and the nature of the supporting evidence. But such a construction of *Escalera* tends to overlook the points that in *Escalera* the housing authority's leases provided that they "can be terminated at the end of any month by either party", and that if the housing authority were like an ordinary landlord it could have summarily evicted the tenant without giving a notice alleging additional good cause. For a court to say that a notice is so uninformative as to be inadequate is, in effect, to rule that the sender of the notice, despite what the lease provides, may not act capriciously, that is without good cause.

environment. This includes adequate, safe, and sanitary quarters. But it also implies an atmosphere of stability, security, neighborliness, and social justice.

A tenant in a public housing project has been selected because he met certain specified qualifications. Unless there is a reason to require him to move he is being deprived of a status he regards as an "entitlement". See Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287. If he is required to move he is unlikely to find housing of equivalent quality at equivalent price. He will have to bear the expenses of moving. He may be making a sentimental sacrifice in moving from familiar quarters. These changes may affect his emotional stability.

Furthermore, in many cases the tenant and his neighbors have come to consider him as a citizen of the housing project's community, as he is a citizen of city, county, commonwealth, and country. If he is evicted capriciously both he and his neighbors will feel a sense of injustice. This will create an atmosphere of hostility to the managers of the projects, and may deter desirable persons with a feeling of independence from applying for or renewing leases. There will be less basis for treating a public housing project as a venture in participatory democracy, and as a counterweight to the anomie and alienation often characteristic of modern urban communities.

To be sure, there are disadvantages to the governmental landlord who is precluded from evicting a tenant from a housing project until he gives the tenant notice of good cause. Sometimes a tenant who is constantly troublesome to his neighbors, and unnecessarily burdensome to the operator of a large scale housing enterprise has not done some one or two things which are so obviously wrong and so readily provable as to be suitable grounds to be alleged in a notice as good cause for terminating a lease. Moreover, if the government must give good cause for terminating a tenancy then, in effect, there are no longer monthly or annual leases. A tenant may remain, if not forever, at least until he misbehaves; or he becomes rich, or the government adopts general rules under which he no longer qualifies.

Yet, on the whole, the disadvantages the government will suffer from being required to allege good cause for eviction are not to be compared with the disadvantages that a tenant will suffer if he is evicted capriciously. His position may not be economically as pitiful as that of the recipient of welfare benefits whose "brutal need" was cut off without cause, see Goldberg v. Kelly, 397 U.S. 254, 261, 90 S.Ct. 1011, 25 L.Ed.2d 287, but he suffers not only in purse, but in spirit, in companionship, and in his sense of the justice of our society.

■ The only novel question presented in this case is whether the reasons that have led courts to require a wholly governmental body to give a tenant of a housing project a notice stating good cause (other than the expiration of the lease) apply to a private § 221(d) (3) landlord acting pursuant to an FHA regulatory agreement and receiving assistance from the state government as well as from the national government.

All the arguments which favored imposing the obligation of a good-cause notice in the case of a governmental landlord apply to a § 221(d) (3) landlord. But it may be contended that the § 221(d) (3) landlord is entitled to somewhat more discretion as to a troublesome or burdensome tenant. However, that contention is not substantial. The § 221(d) (3) landlord chose to enter into a project he knew was primarily for the tenants' benefit and in which he would be closely regulated. Realistically, relatively little of the financing comes from him. Part is contributed by the state and its subdivisions by their sale to him of the premises at a bargain price and by their taxation of him at a reduced rate. Part is contributed by the federal government's credit. Ordinarily only 10% of the cash comes from the landlord. 90% comes from a bank loan secured by a mortgage on the premises.

The loan is in a principal amount representing a larger fraction of the value of the premises, and is at a lower rate of interest, than would be the situation were the landlord the only party liable on the note. It is the secondary liability of the FHA which induces the bank to give such favorable terms with respect to principal and interest.

Moreover, the § 221(d)(3) landlord's interest is economic not personal. He himself is not apt to be an occupant of part of the premises. Nor is he likely to be housing personal friends. Indeed he can take only such applicants as meet certain standards of need. He cannot make a higher charge for a new tenant than for an old tenant. All the landlord may legitimately seek is a tenant who is not delinquent in rental payments and abides by reasonable regulations for the care of property and the comfort of neighbors.

In short, this court concludes that, as a matter of substantive law, plaintiffs here may not be evicted without receiving a notice which specifies good cause for the termination of their tenancy. The provisions of the lease which purport to give the landlord the power to terminate without cause at the expiration of a fixed term are invalid. See Frank I. Michelman, The Advent of a Right to Housing: A Current Appraisal, Harvard Civil Rights Civil Liberties Law Review, Vol. V, page 219.

But this leaves questions as to what opportunities the Constitution gives to the tenant to have a hearing on a good-cause notice: when it is to be conducted, by whom, with what rights to confront witnesses, to examine them, to offer additional witnesses, and to receive a reasoned determination upon the evidence received. Those are questions of procedural due process. Escalera v. New York City Housing Authority, 425 F.2d 853 (2nd Cir.). They arise under both the Fifth and the Fourteenth Amendments because here defendants are acting for both the federal and state governments.

Here a tenant cannot be evicted except by a proceeding in the state courts.

Thus the problem is whether those courts will give the tenant an opportunity for a full hearing on and determination of the two issues raised by the landlord's notice: that is, whether the notice, as a matter of law, alleges good cause, and whether, as a matter of fact, the landlord can prove the alleged good cause. If the state court provides such an opportunity no other opportunity for hearing is required by the due process clauses. Cf. Willner v. Committee on Character, 373 U.S. 96, 105 lines 6–9, 83 S.Ct. 1175, 10 L.Ed.2d 224. The tenant does not need any earlier hearing because his occupancy is not interrupted, and he is not in immediate economic jeopardy as were the beneficiaries in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287.

It is probable that such a full hearing would not heretofore have been possible in the courts of the Commonwealth. The state courts would probably not have held on their own initiative that a § 221(d)(3) landlord had to give a good-cause notice to a tenant whose term had expired, and that until he gave such notice the landlord would not evict the tenant. But if it is, as this court now holds, federal law that before evicting a tenant a § 221(d)(3) landlord must give his tenant a good-cause notice and prove that such good cause exists, then there is no reason to doubt that the state courts will follow that rule of federal law. See the second clause of the Sixth Article to the United States Constitution.

Indeed, the state courts have shown they recognize that in local eviction proceedings landlords are subject to provisions in federal law intended for the protection of tenants. Noyes v. Shanahan, 325 Mass. 601, 604, 91 N.E.2d 841; Gabriel v. Borowy, 324 Mass. 231, 232, 236, 85 N.E.2d 435.

Furthermore, the kinds of questions which will arise in an attempt of a § 221(d)(3) landlord to evict a tenant will resemble (except for the *de novo* aspect and possibly the burden of proof aspect of a § 221(d)(3) eviction case) the liti-

gation which will arise under the following provision of the recently enacted Housing and Urban Renewal Act, Act of August 21, 1969, St.1969, c. 751, § 1, Mass.G.L. c. 121B § 32:

> "The tenancy of a tenant of a [Commonwealth of Massachusetts] housing authority shall not be terminated without cause and without reasons therefor given to said tenant in writing. A tenant at his request shall, except in the case of nonpayment of rent, be granted a hearing by a housing authority at least fifteen days prior to any such termination. The housing authority's determination of cause shall be reviewable in the district court whenever an action for summary process is brought for possession of the premises."

■ From what has been said it follows that plaintiffs are entitled to a declaration of their rights not to be evicted until they receive from defendants a notice alleging good cause and have in the state courts a hearing in which the court determines that defendants have alleged and proved good cause. Plaintiffs are also entitled to an injunction against defendants prosecuting the eviction proceedings heretofore commenced under defendants' May 29, 1970 notice.

Plaintiffs have not shown that they suffered any damages which are recoverable.

### 3. Plaintiffs' rights to be protected against retaliation for having engaged in constitutionally protected activity

The next issue is whether plaintiffs are also entitled to a declaratory judgment and to an injunction upon the second count of their complaint alleging that defendants' notice to evict was in retaliation for plaintiffs' exercise of First Amendment liberties. This issue is not made moot by what has already been decided, because the scope of declaratory relief sought under counts 1 and 2 differ.

■ This court found as a fact that the chief reason defendants gave plaintiffs notice to quit was their associational activities on behalf of their fellow tenants, their petitions to the FHA to the courts for the redress of grievances, and their defense of their own rights in the courts. In all of those actions plaintiffs were pursuing liberties embraced by the First Amendment. Because of their relation to the federal and state governments, heretofore described, defendants were prohibited by the First and Fourteenth Amendments from basing their notice terminating plaintiffs' lease and their refusal to renew plaintiffs' lease on the plaintiffs' exercise of their First Amendment liberties. Thorpe v. Housing Authority of City of Durham, 393 U.S. 268, 283, 89 S.Ct. 518, 21 L.Ed.2d 474.

On count 2 plaintiffs are entitled to a declaratory judgment that defendants may not seek to evict them for exercising their First Amendment rights. Moreover, an injunction prohibiting defendants from evicting plaintiffs pursuant to the May 29, 1970 notice is warranted by count 2 as well as by count 1 of the complaint.

### 4. Jurisdiction and allied problems

28 U.S.C. § 1343(3) provides that "the district courts shall have original jurisdiction of any civil action * * * to redress the deprivation, under color of any State law * * * custom or usage, of any right * '* * secured by the Constitution of the United States."

Plaintiffs have a constitutional right to be heard on the cause of their eviction. They also have a constitutional right not to be evicted for exercising First Amendment liberties.

■ If this court does not act on this case, defendants will go to the state district court to seek summary eviction of plaintiffs. The parties before this court seem to agree, and insofar as it is appropriate to do so, this court takes judicial notice, that as of now (that is, before there is an authoritative

ruling by a federal court) the state district court would by custom and usage proceed to evict the plaintiffs upon the basis of the landlords' notice and proof that the period of the tenancy had expired, and would not give plaintiffs a hearing on the issues of good-cause. Nor would the state district court (by stretching Mass.St.1969, c. 701 § 2, Mass.G.L. c. 239 § 2A or otherwise) permit these plaintiffs to show that they were not subject to eviction because these defendants were actuated in seeking eviction by a purpose to retaliate for plaintiffs' exercise of First Amendment rights.

Having shown these circumstances, plaintiffs have stated a cause of action under the Civil Rights Act, 42 U.S.C. § 1983, and within the jurisdiction conferred by 28 U.S.C. § 1343(3). Escalera v. New York City Housing Authority, 425 F.2d 853, 865 (2nd Cir.); Holmes v. New York City Housing Authority, 398 F.2d 262 (2nd Cir.). This is not a situation in which if this court were to refuse jurisdiction the state court in the threatened eviction proceedings would "give conscientious review" [see 77 Yale L.J. 988, 1003, note 76] to the novel proposition that a § 221(d) (3) landlord is not free to evict arbitrarily a tenant at the expiration of his term. See Hosey v. Club Van Cortlandt, 299 F.Supp. 501, 507 (S.D.N.Y.).

There may be an additional basis upon which 28 U.S.C. § 1343(3) jurisdiction might rest. Here the Commonwealth of Massachusetts is so intertwined with defendants' operations that anything defendants do to deny plaintiffs their constitutional right to be heard with respect to the grounds of their eviction constitutes state action covered by 42 U.S.C. § 1983, and subject to this court's jurisdiction under 28 U.S.C. § 1343(3). Colon v. Tompkins Sq. Neighbors, Inc., 294 F.Supp. 134, 137. Cf. Smith v. Holiday Inns of America, Inc., 336 F.2d 630, 634–635 (6th Cir.).

One other point deserves notice. The provisions of 28 U.S.C. § 2283, prohibiting injunctions against proceedings in a state court, do not apply because this court was seized of jurisdiction before the state court was. Dombrowski v. Pfister, 380 U.S. 479, 484, note 2, 85 S.Ct. 1116, 14 L.Ed.2d 22. Moreover, it is, as the case just cited notes, doubtful if 28 U.S.C. § 2283 applies to a complaint seeking to enjoin a threatened violation by a state court of a plaintiff's constitutional rights protected under a civil rights statute.

Decree for plaintiffs.