TURABO LIMITED PARTNERSHIP h/n/c VISTAS DEL TURABO APTS., demandante y recurrido, *v.* MARCIAL VELARDO ORTIZ ET AL., demandados y peticionarios; MONTE DE ORO ASSOCIATES, demandante y recurrida, *v.* EDWIN MALDONADO FIGUEROA y KEURYN SOLANO MEJÍAS, ETC., demandados y peticionarios.

*Números:* CE-89-206      *Resueltos:* 8 de abril de 1992
CE-89-312

228

*María Dolores Fernós*, de *Servicios Legales de Puerto Rico, Inc.*, abogada de Marcial Velardo Ortiz y otros, peticionarios; *Erasmo Reyes Peña*, abogado de Turabo Limited Partnership h/n/c Vistas del Turabo Apts., recurrido; *René Esteves Tristani*, de *Martínez Álvarez, Fernández Paoli, Menéndez Monroig, Menéndez Cortada & Lefranc Romero*, abogados de la Puerto Rico Lease Housing Association, Inc.; *Bernardo Hernández Berríos* y *César A. Vélez Miranda*, abogados de la Corporación de Renovación Urbana y Vivienda; *Adalina de Jesús*, abogada del Instituto Puertorriqueño de Derechos Civiles, *amicus curiae*.

*Aleida Varona Méndez*, de *Servicios Legales de Puerto Rico, Inc.*, abogada de Edwin Maldonado Figueroa y Keuryn Solano Mejías, etc., peticionarios; *Erasmo Reyes Peña*, de *William Estrella Law Offices*, abogado de Monte de Oro Associates, recurrido; *René Esteves Tristani*, de *Martínez Álvarez, Fernández Paoli, Menéndez Monroig, Menéndez Cortada & Lefranc Romero*, abogado de la Puerto Rico Lease Housing Association, Inc.; *Adalina de Jesús*, abogada del Instituto Puertorriqueño de Derechos Civiles; *Bernardo Hernández Berríos* y *César A. Vélez Miranda*, abogados de la Corporación de Renovación Urbana y Vivienda, *amicus curiae*.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

La característica medular de un procedimiento civil sumario es lograr, lo más rápido y económicamente posible, la reivindicación de determinados derechos, reduciendo al mínimo constitucionalmente permisible el elenco de garantías procesales. Conlleva acortar términos —en ocasiones, hacerlos improrrogables— y prescindir de ciertos trámites comunes al proceso ordinario sin negar al demandado o querellado una oportunidad real de presentar efectivamente sus defensas. Se acepta que estos procedimientos sumarios, en el fondo, constituyen unos tratos privilegiados y que su justificación responde a un interés gubernamental legítimo de atender prioritariamente ciertas causas de acción. Por ser la excepción, su aplicación está limitada a situaciones expresas en que la Asamblea Legislativa ha reconocido la necesidad y trascendencia de reparar, en un breve plazo, algún agravio.

Estos recursos versan precisamente sobre uno de los procedimientos más utilizados en nuestro país para reivindicar, mediante trámite y juicio sumario, la posesión y

el disfrute de un inmueble: *el desahucio*. Art. 620 *et seq.* del Código de Enjuiciamiento Civil de Puerto Rico, 32 L.P.R.A. sec. 2821 *et seq.* Aunque data desde principios de siglo, a tono con los desarrollos jurisprudenciales y aun en situaciones no previstas, hemos mantenido íntegro su carácter sumario, a la par que hemos permitido la presentación de defensas relacionadas íntimamente con las causas de desahucio alegadas. *Mora Dev. Corp. v. Sandín*, 118 D.P.R. 733, 748 (1987), y casos allí citados.

## II

Hoy, a solicitud de los esposos Marcial Velardo Ortiz y Miriam Carrión Vélez, y Edwin Maldonado Figueroa y Keuryn Solano Mejías —representados por Servicios Legales de Puerto Rico, Inc.— examinamos y reiteramos la constitucionalidad de este trámite y juicio sumario. Aducen que poseen un interés propietario protegido contra actuaciones encaminadas a privarles de la vivienda que disfrutan. Sostienen, además, que *todo* procedimiento de desahucio debe tornarse ordinario desde el momento en que surja la posibilidad de alguna defensa por parte del arrendatario.

A diferencia de *Mora Dev. Corp. v. Sandín,* supra, estas acciones *se encuentran pendientes.* Inciden, no obstante, en que los peticionarios separadamente disfrutaban del subsidio de renta federal provisto por la Sec. 8 del *Housing and Community Development Act of 1974* (H.C.D.A.), 42 U.S.C. sec. 1437f. Este programa requiere de los arrendadores el cumplimiento de una serie de requisitos procesales y sustantivos antes de instar cualquier acción judicial de desalojo.

Oportunamente consolidamos los recursos. Contamos con el beneficio de los escritos de las recurridas Turabo Limited Partnership (Turabo), Monte de Oro Associates (Monte de Oro) y de los *amicii curiae*, Corporación de Re-

novación Urbana y Vivienda de Puerto Rico, Puerto Rico Lease Housing Association, Inc. y el Instituto Puertorriqueño de Derechos Civiles. Expongamos la situación fáctica-procesal atinente a cada caso.

## III

*Turabo Limited Partnership v. Marcial Velardo Ortiz y otros*, CE-89-206

Los esposos Velardo-Carrión ocupaban una unidad residencial en el Condominio Vistas del Turabo, Caguas, cuyo canon era subsidiado por el programa federal aludido. Las relaciones arrendatario-arrendador estaban estrictamente reguladas por disposiciones estatutarias y reglamentarias, algunas de las cuales quedaron expresamente consignadas en el contrato de arrendamiento.

El 19 de julio de 1988, Interstate General Properties Limited Partnership, S.P. (Interstate), agente administrador del proyecto, notificó a Velardo Ortiz su intención de terminar, esto es, la resolución del contrato.(¹)

---

(¹) Aunque la reglamentación federal usa el vocablo *terminar* (*terminate*) —24 C.F.R. sec. 880.607 (1992)— verdaderamente estamos ante una "resolución" de contrato. En situaciones anteriores, una y otra vez los conceptos de *resolución* y *rescisión* han sido indistintamente utilizados y aplicados, "no sólo en el lenguaje corriente, sino incluso en el mismo Código se usa a veces la palabra rescisión en un sentido que no corresponde al de la 'rescisión de los contratos' que regulan los artículos 1290 a 1299 [(1242–1251 nuestros, 31 L.P.R.A. secs. 3491–3500)]. Generalmente se trata de supuestos de resolución del vínculo obligatorio por utilizar uno de los contratantes una facultad creada a tal efecto de manera convencional o por atribución de ley. Por ejemplo el art. 1.556 [(1446 nuestro, 31 L.P.R.A. sec. 4053)], sobre incumplimiento de obligaciones del arrendador o del arrendatario, habla de pedir la 'rescisión' del contrato, a pesar de tratarse de un supuesto característico de resolución ...". J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1978, T. II, Vol. 1, pág. 338.

De igual modo se pronuncia Castán: "La rescisión es una forma de ineficacia, motivada por la lesión o perjuicio que el contrato cause a los contratantes o a terceras personas. La resolución es la ineficacia debida a la voluntad informadora del contrato mismo, ya se manifieste esta voluntad expresamente (como en el caso de la condición resolutoria), ya tácitamente (como en el caso de la resolución judicial a

Invitó su atención a "sus constantes y variadas violaciones a la Sección 23 y al Reglamento de la Vivienda de su contrato de arrendamiento, as[í] como también sus violaciones a las normas de convivencia que rigen su estadía en el proyecto". Caso Núm. CE-89-206, Apéndice X, pág. 30. Además, específicamente le imputó: "(1) Falta de respeto a nuestros representantes en el proyecto[;] (2) Uso de lenguaje soez[, y] (3) Alterar la paz en el vecindario". Íd.

A pesar de que Interstate fijó el 19 de agosto de 1988 como fecha efectiva de la resolución, le concedió un plazo de diez (10) días a Velardo Ortiz para reunirse y discutir la situación. La reunión fue celebrada el 28 de julio y Velardo Ortiz solicitó reconsideración. El 29 de julio fue notificado de que los procedimientos continuarían.

Velardo Ortiz se negó a desalojar. El 13 de septiembre de 1988, Interstate reiteró por escrito su requerimiento. Luego de hacer alusión y mencionarle su conducta anterior, le señaló unas nuevas violaciones surgidas en una evaluación *posterior*, a saber, "amenazas contra los residentes del proyecto". Caso Núm. CE-89-206, Apéndice, pág. 31. Además, evocó otros incidentes pasados contrarios

---

virtud de incumplimiento del contrato por una de las partes). *Cualesquiera que sean las denominaciones, no siempre propias, que adopte el legislador o empleen los contratantes, el rompimiento del contrato como consecuencia de su vulneración por una de las partes (haya sido o no previsto y autorizado expresamente por éstas) es, pues, un caso de resolución y no de rescisión.* La hipótesis aludida por el art. 1.556 [(1446 nuestro)] del C.c. ninguna relación guarda con las rescisión por lesión; y, en cambio, es innegable su parentesco con la resolución por incumplimiento de contrato bilateral. Como dice Manresa, dicho artículo 'contiene una evidente aplicación del principio del art. 1.124' [(1077 nuestro, 31 L.P.R.A. sec. 3052)]." (Énfasis en el original suprimido, énfasis suplido y escolios omitidos.) J. Castán, *Jurisprudencia del T.S.*, 15 Rev. Der. Priv. 321, 323–324 (1928).

En Puerto Rico, a pesar de que nuestro Art. 1446 del Código Civil, 31 L.P.R.A. sec. 4053, en estricto rigor obliga a la palabra *rescisión*, entendemos que la mejor doctrina que se ha de seguir es referirnos a "resolución" del contrato de arrendamiento. Y es que el efecto retroactivo que en términos generales tiene la resolución de contratos no aplica a los contratos de tracto sucesivo, como lo es el de arrendamiento, en el cual las prestaciones se realizan en una serie de actos y cumplimientos continuos, repetidos y sucesivos, pues tales prestaciones siguen teniendo efectividad jurídica hasta que se resuelva el contrato por sentencia firme. *Campos v. Tribl. Superior*, 75 D.P.R. 370, 376 (1953).

al contrato de arrendamiento. Finalmente fue apercibido del desahucio por la vía judicial.(²)

El 9 de diciembre de 1988, Turabo instó en el Tribunal Superior, Sala de Caguas, el desahucio por incumplimiento del contrato de arrendamiento y del reglamento aplicable. Los esposos Velardo-Carrión contestaron la demanda, negaron el incumplimiento y presentaron una reconvención. A su vez, sin éxito, pidieron la conversión del procedimiento sumario a uno ordinario con derecho a obtener su expediente residencial, lista de testigos y procedimientos de los empleados; además, tiempo para el descubrimiento de prueba y la toma de deposiciones. En vista posterior, el tribunal (Hon. Roberto R. Muñoz Arill, Juez) reiteró su negativa de transformar la acción. Las partes acordaron informarse recíprocamente la prueba que utilizarían.

A solicitud de los esposos Velardo-Carrión, revisamos.

## IV

*Monte de Oro Associates v. Edwin Maldonado Figueroa y otros*, CE-89-312

El 20 de agosto de 1982, los esposos Edwin Maldonado Figueroa y Keuryn Solano Mejías ocuparon el apartamento 1109, Condominio Monte de Oro, Río Piedras, con renta subsidiada. Sec. 8 del *Housing and Community Development Act of 1974*, supra.

En el contrato, además de comprometerse a cumplir con las disposiciones estatutarias y reglamentarias aplicables al proyecto, certificaron que la composición familiar que lo ocuparía estaría limitada a ellos y sus hijos.

Los esposos Maldonado-Solano se separaron a comienzos del año 1988. La señora Solano e hijos permanecieron

---

(²) Al igual que el 19 de julio de 1988, en esta notificación también le concedieron diez (10) días para que compareciera ante la Interstate General Properties Limited Partnership, S.P. a discutir la situación que motivara esa determinación.

en·el apartamento. Luego, para abril, ella comenzó una relación amorosa con Luis Negrón, quien, sin estar autorizado, comenzó a vivir en el apartamento. De ese modo, sin estar cualificado, se beneficiaba del programa de subsidios de rentas federal.

Ante esta situación, el 1ro de julio de 1988 Interstate, como agente de Monte de Oro, notificó a Maldonado su decisión de resolver el contrato de arrendamiento efectivo el 1ro de agosto. Adujo el incumplimiento de la prohibición a permitir "personas no autorizadas [a] vivir en la unidad [de vivienda]". Cláusula 23 del contrato, Caso Núm. CE-89-312, Apéndice XXIII, pág. 52. Se le concedieron diez (10) días para que presentara sus comentarios o defensas.

En ningún momento los arrendatarios aprovecharon esa oportunidad; no formularon objeción a los hechos imputados. Aun así, no desalojaron. El 9 de agosto de 1988 Monte de Oro presentó ante el Tribunal Superior, Sala de San Juan, la acción de desahucio.

La codemandada señora Solano fue emplazada y la primera comparecencia —fijada para el 9 de septiembre de 1988— fue reseñalada para el 14 de octubre. En ésta, ante su disposición de divorciarse de Maldonado Figueroa, casarse con Negrón y solicitar autorización para él residir allí, se exploró la posibilidad de lograr un acuerdo que finiquitara la acción judicial. El tribunal concedió a los demandados diez (10) días para que contestaran y señaló una conferencia sobre el estado procesal para el 28 de noviembre.

El 18 de octubre de 1988 Interstate notificó por escrito a la señora Solano nuevamente la resolución del contrato. Además de invocar la violación de haber permitido personas no autorizadas a vivir en la unidad arrendada, añadió:

Ignorando orientaciones e intervenciones del personal de nuestro Departamento de Relaciones con la Comunidad y de nuestra Gerente de Arrendamiento ha continuado usted en abierta violación perjudicando así a otros residentes.

Las violaciones a que nos referimos son:
  (1) Ropa tendida en las ventanas.
  (2) Conducta impropia de sus hijos.
  (3) Conducta impropia de sus visitantes.
  (4) Mal uso de las áreas de estacionamiento.
  (5) Permitir personas no autorizadas a vivir la unidad arrendada.
  (6) Ruidos innecesarios a altas horas de la noche.
  (7) Uso de lenguaje soez. Caso Núm. CE-89-312, Apéndice, pág. 000017.

Se le concedieron diez (10) días para que informaran su posición al respecto.[3] Esta última notificación fue seguida de una llamada telefónica de la representación legal de Monte de Oro a los abogados de la señora Solano en la que le indicaron que un arreglo de la controversia resultaba inaceptable, puesto que Negrón no sería bienvenido como inquilino. La decisión se debió a los problemas que éste había ocasionado en la comunidad. Esta posición fue reiterada por carta.

La señora Solano negó los hechos esenciales alegados por Monte de Oro y formuló también una reconvención por alegados daños.

Oportunamente Monte de Oro solicitó permiso del foro de instancia para enmendar sus alegaciones.[4] La señora Solano pidió la desestimación. Entre otros fundamentos adujo que Monte de Oro —contrario a las reglamentaciones federales aplicables— comenzó el procedimiento judicial de desahucio *antes* de que venciera el plazo de diez (10) días desde la notificación de 18 de octubre de 1988. Igualmente sostuvo que no se le dio oportunidad de exponer su

---

[3] A pesar de que esta notificación de 18 de octubre de 1988 expresa que la resolución sería ese mismo día, notamos que se concedió un término para que explicaran su posición.

Entendemos que la resolución fundada en estas nuevas violaciones sería efectiva con posterioridad al vencimiento de ese término.

[4] Se suscitó una controversia sobre la fecha de presentación de esta solicitud y otros escritos, toda vez que los originales obrantes en los autos carecían del sello fechado de recibo de la Secretaría del Tribunal. Por el resultado llegado es innecesario abundar en este asunto.

posición, pues la administradora del proyecto no le prestó atención debido a que el caso estaba en los tribunales.([5])

Subsiguientemente, luego que cada parte expusiera por escrito sus respectivos argumentos, el tribunal de instancia (Hon. Gilberto Gierbolini, Juez) permitió la demanda enmendada. Además, declaró sin lugar la desestimación, ordenó el archivo de la reconvención *sin perjuicio* y señaló la segunda comparecencia. A solicitud de la señora Solano, revisamos.

## V

La necesidad de que ocasionalmente el procedimiento sumario de desahucio se convierta en uno ordinario, no puede llevarnos a configurar una regla automática. A fin de cuentas, dentro del marco procesal sumario de la Ley de Desahucio, el sano discernimiento judicial será la guía para prorrogar términos, posponer señalamientos y permitir enmiendas a las alegaciones. *Más et al. v. Borinquen Sugar Co.*, 18 D.P.R. 304, 311–312 (1912).

Esta discreción del juez cobra mayor importancia ante situaciones en las que se solicita el desahucio de un inquilino que recibe subsidio federal o de otras fuentes gubernamentales. *Mora Dev. Corp. v. Sandín*, supra, pág. 752. Y es que ese esquema federal constituye una compleja madeja estatutaria y reglamentaria que regula los aspectos sustantivos, contractuales y procesales, desde la selección del arrendatario y las normas de convivencia hasta su desalojo por incumplimiento. "[G]arantías adicionales han de concederse al arrendatario bajo la Sec. 8. La extensión de estas garantías adicionales no puede determinarse sin

---

([5]) Veremos, pues, cómo negarle tal oportunidad incide directamente en la solución del caso. Consideraciones procesales establecidas por la *Housing and Community Development Act of 1974* (H.C.D.A.), las reglamentaciones y los manuales adoptados requieren un *estricto* cumplimiento del procedimiento establecido.

antes sopesar los intereses del arrendatario, el casero y el gobierno ...". (Escolio omitido y traducción nuestra.) J.M. Klein y J.E. Schridder, Jr., *Procedural Due Process and the Section 8 Leased Housing Program*, 66 Ky. L. J. 303, 346 (1977–1978). Ante esta realidad, el Art. 628 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2829, es sólo un instrumento más para canalizar y concretar, por vía judicial, los derechos y la obligaciones de cada parte.

La aprobación por el Congreso del programa de beneficencia social *Housing and Community Development Act of 1974* (H.C.D.A.) fue con el fin de proveer una vivienda adecuada a las familias de escasos recursos. Fomentó la participación de la empresa privada —al igual que de agencias de vivienda pública— concediéndole incentivos económicos para rehabilitar edificaciones existentes y brindó beneficios a aquellos que dedicaran sus esfuerzos a la construcción de nuevas residencias. Klein y Schridder, *supra*, pág. 329 (24 C.F.R. sec. 880.101(a) (1992)).

Bajo la citada Sec. 8, las entidades públicas y privadas participantes se comprometían a cumplir con una amplia gama de reglamentos y disposiciones estatutarias que en cierta medida restringían sus derechos propietarios. A cambio, recibirían un sinnúmero de beneficios del Departamento de la Vivienda y Desarrollo Urbano Federal (H.U.D.) tales como el pago directo del subsidio hasta una garantía de la renta de mercado en caso de incumplir el arrendatario. Incluso, por un término específico y en circunstancias establecidas, H.U.D. se obligaba a satisfacer a los arrendadores participantes los cánones de unidades de vivienda desocupadas. 24 C.F.R. secs. 880.504 y 880.611 (1992).

Estas disposiciones, además, imponen al arrendador, con sujeción a los criterios de H.U.D., la obligación de mercadear el proyecto, administrarlo y proveerle

mantenimiento. 24 C.F.R. secs. 880.601 y 880.602 (1992); Klein y Schridder, *supra*, pág. 308. De ese modo H.U.D., como agencia federal, regula a través del arrendador *la elegibilidad de los beneficiarios* del subsidio, 24 C.F.R. secs. 880.603 y 880.613 (1992); los *términos, cláusulas y condiciones de arrendamiento,* 24 C.F.R. sec. 880.606 (1992); su terminación ("resolución") y el "desalojo" de las unidades, 24 C.F.R. sec. 880.607 (1992). Además, la H.U.D. —como administrador del contrato de subsidios— se reserva la prerrogativa de inspeccionar y evaluar el proyecto a los fines de cerciorarse: (a) que el arrendador está cumpliendo con los términos bajo los cuales se sometió al programa, y (b) determinar que el proyecto está en condiciones habitables y seguras. 24 C.F.R. sec. 880.612 (1992).

Al poner en efecto los contratos de arrendamiento subsidiados por la Sec. 8 del *Housing and Community Development Act of 1974*, supra, los arrendadores, al igual que sus agentes y representantes, han de seguir las pautas dictadas por la H.U.D. en su manual *Occupancy Requirements of Subsidized Multifamily Housing Programs*, Departamento de Vivienda y Desarrollo Urbano Federal, noviembre de 1981, Núm. 4350.3 (Manual). Respecto a la resolución de contratos y desalojo, la Sec. 5, Cap. 4 del Manual dispone que sólo podrá lanzarse a los arrendatarios por "(1) incumplimiento(⁶) del contrato de arrendamiento[;] (2) omisión de llevar a cabo obligaciones impuestas por cualquier ley estatal sobre arrendamiento[, o por] (3) 'otra justa causa'...". (Traducción nuestra.) Un "incumplimiento material" en el contrato de arrendamiento surgirá cuando concurra:

---

(⁶) El incumplimiento que conlleva la resolución del contrato debe ser de naturaleza material. Reglamento del Departamento de Vivienda y Desarrollo Urbano Federal (H.U.D.), 24 C.F.R. sec. 880.607(b) (1992). Similar criterio ha de aplicarse a la omisión de cumplir con las leyes estatales pertinentes.

(1) una o más violaciones sustanciales al arrendamiento [incluyendo la falta de pago de la renta o];

(2) *reiteradas violaciones menores al arrendamiento* que:

a. *alteren adversamente la convivencia en el proyecto,*

b. *afecten la salud o seguridad de cualquier persona, menoscaben el derecho de cualquier arrendatario de disfrutar tranquilamente de los predios arrendados y sus facilidades,*

c. *Interfieran con la administración del proyecto,* o

d. *tengan un efecto económico adverso en el proyecto.* (Traducción y énfasis nuestros.) Manual, *supra,* pág. 4-14.

Ilustrativo de ello resulta ser la "falta de pago de la renta más allá de cualquier período de gracia disponible por legislación estatal"; *"interferencias reiteradas con los derechos y el tranquilo disfrute de otros arrendatarios"*, y "ofrecer al arrendador información falsa respecto al ingreso u otros factores a considerar al determinar la renta del arrendatario". (Traducción y énfasis nuestros.) Íd., pág. 4-14.

Procesalmente se requiere que el arrendador observe unas normas que garanticen a los arrendatarios un mínimo de protección. Klein y Schridder, *supra,* pág. 327. Se establece, así, un balance entre los intereses del arrendador privado y el arrendatario, concediendo a este último una vista evidenciaria en los tribunales. Íd., pág. 326; 41 Fed. Reg. 43,330-43, 331 (1976). A tal efecto, deberá ser notificado por escrito de la resolución y el desalojo propuesto, informándosele específicamente: (1) la fecha en que el contrato habrá de terminar; (2) las razones en que se funda su decisión "con suficiente detalle para que el arrendatario prepare una defensa" (Manual, *supra,* pág. 4-15); (3) instruirle que tiene a su disposición el término de diez (10) días para discutir la rescisión propuesta, y (4) de su derecho a defenderse en los tribunales. Manual, *supra.* Después de cumplir con este trámite, podrá instarse la acción judicial de desahucio fundada *exclusivamente* en las razones notificadas. Todas estas condiciones están expresamente incorporadas a la Sec. 23, Rescisión del arrenda-

miento, modelo provisto por la H.U.D. sobre contrato de arrendamiento. Manual, *supra*, Ap. 20.

Es obvio que este esquema federal establece unas condiciones compatibles con la naturaleza bilateral de las obligaciones en un contrato de arrendamiento. Si el arrendador no las cumple, el arrendatario puede oponerlas como defensas. De este modo, se configuran varias defensas susceptibles de ventilarse en el procedimiento clásico sumario de desahucio estatal. Nota, *Procedural Due Process in Government-Subsidized Housing*, 86 Harv. L. Rev. 880, 908–909 (1973).[7]

La situación no ha pasado desapercibida en nuestra jurisprudencia. Así, bajo la Ley de Desahucio hemos reconocido que estas defensas y otras deberán ser alegadas oportunamente por el arrendatario, de manera que no dilate innecesariamente los procedimientos. En *Mora Dev. Corp. v. Sandín*, supra —ante la causal de falta de pago— se adujo la defensa de que el casero no había reajustado la renta conforme a los requisitos de la Sec. 8 del *Housing and Community Development Act of 1974*, supra; en *Más et al. v. Borinquen Sugar Co.*, supra, frente a igual alegación se argumentó la defensa de que los actos del casero le impedían instar la acción al no aceptar el pago; en *Marín v. Montijo*, 109 D.P.R. 268 (1979), se esgrimió como defensa que el arrendatario tenía derecho a retener el bien hasta tanto le reembolsaran los costos de las reparaciones que realizara, y en *Brunet v. Corte*, 45 D.P.R. 901 (1933), se permitió la defensa de que la posesión del inmueble la tenía el demandado a base de un título distinto al de arrendamiento. Esta casuística arroja una sola conclusión: una vez esgrimidas estas defensas, el juzgador deberá aus-

---

[7] Sobre la disponibilidad del procedimiento de desahucio en vivienda privada subsidiada, véanse: *Joy v. Daniels*, 479 F.2d 1236 (4to Cir. 1973); *Anderson v. Denny*, 365 F. Supp. 1254 (W.D. Va. 1973); *McQueen v. Druker*, 317 F. Supp. 1122 (D. Mass. 1970), confirmada en 438 F.2d. 781 (1er Cir. 1971).

cultar sus méritos, los hechos específicos que se aducen y discrecionalmente ordenar la conversión del procedimiento al juicio ordinario.

Lo expuesto derrota el reclamo de inconstitucionalidad y nos permite trazar las coordenadas decisorias justas.

## VI

En cuanto a los esposos Velardo-Carrión, es un hecho no contradicho que Interstate les notificó en *dos* (2) ocasiones —19 de julio y 13 de septiembre de 1988— su intención de lanzarlos y las razones. La última notificación consignó claramente: faltar el respeto a los representantes de la administradora, utilizar lenguaje soez, alterar la paz de la comunidad y proferir amenazas contra sus vecinos. Esa especificación y ese detalle, ciertamente, constituyeron suficiente advertencia de los hechos imputados e hicieron viable que se prepararan para discutirlos con Interstate en la reunión fijada.[8] Como cuestión de hecho, así sucedió tras la primera notificación cursada; incluso, después, solicitaron reconsideración.

Luego de la notificación de 13 de septiembre de 1988 y antes de instar el desahucio, Interstate esperó los diez (10) días concedidos para que los esposos Velardo-Carrión comparecieran a discutir la propuesta resolución.

De este modo, Interstate cumplió cabalmente con los requisitos estatutarios y reglamentarios antes de la resolución de un contrato de arrendamiento bajo la Sec. 8 del *Housing and Community Development Act of 1974,* supra. Culminado ese trámite, podía solicitar judicialmente el desahucio para lo cual eligió el procedimiento sumario.

El argumento de los peticionarios Velardo-Ca-

---

[8] Advertimos a los caseros de viviendas subsidiadas bajo la Sec. 8 del *Housing and Community Development Act of 1974* (H.C.D.A.), 42 U.S.C. sec. 1437f, de la necesidad y conveniencia de detallar las razones en las notificaciones requeridas.

rrión, basado en que aquí estaban implicados extensos estatutos y reglamentos federales, no era impedimento per se para ventilar el juicio sumariamente. Más allá de sus alegaciones, no demostraron hechos específicos que justificaran convertir el procedimiento en uno ordinario. Actuó correctamente la ilustrada sala de instancia.

## VII

La situación de la señora Solano es distinta. Oportunamente, esgrimió y formuló como defensa el incumplimiento por Monte de Oro de los requisitos procesales estatutarios y reglamentarios federales aplicables, al negarle la oportunidad de discutir las razones aducidas para la pretendida resolución dentro de los diez (10) días siguientes a la notificación de 18 de octubre de 1988.

■ La mencionada notificación efectivamente *reemplazaba* aquella cursada el 1ro de julio de 1988. Ante esa circunstancia, para poder proceder por la vía judicial Monte de Oro tenía que cumplir *de nuevo con cada uno de los requisitos procesales previamente establecidos*, entre otros, por el Manual.

■ La alegación de que no se brindó la oportunidad de discutir con el casero las razones que motivaban la intención de resolución de 18 de octubre de 1988 —sostenida con hechos específicos— puso en entredicho la capacidad de Monte de Oro para continuar, por la vía judicial de desahucio, su reclamación enmendada.

■ El tribunal de instancia debió auscultar y determinar si se cumplieron las disposiciones reglamentarias del mencionado manual. Esa incursión judicial pudo hacerse sin desnaturalizar el carácter sumario del procedimiento, requiriendo la comparecencia escrita u oral de las partes en un plazo breve. De ese modo, posiblemente se

hubiese percatado —como lo hemos hecho nosotros— de la naturaleza, la complejidad y los méritos de esa defensa, y, en consecuencia, que *procedía* desestimar la acción.

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Fuster Berlingeri no intervino.