**Eva M. McCLELLAN and Harriet Wiggins, individually and on behalf of all others similarly situated**

**v.**

**UNIVERSITY HEIGHTS, INC., et al.**

**Civ. A. No. 4707.**

United States District Court,
D. Rhode Island.

Feb. 15, 1972.

John M. Roney and Bernard Grossberg, R. I. Legal Services, Inc., Providence, R. I., for plaintiffs.

Edward J. Regan, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

⸱This action seeks to explore the restraints imposed by the Due Process clause upon landlords of certain federally-assisted housing in evicting their tenants on expiration of leases. Two such tenants, Eva McClellan and Harriet Wiggins, individually and as representatives of a class, seek declaratory and injunctive relief from their threatened eviction from University Heights, an apartment complex financed by mortgage loans guaranteed through § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l*(d)(3).

They cannot be evicted, they assert, consonant with the Fifth and Fourteenth Amendments, except for good cause and notice and opportunity for a full, fair and impartial hearing as to the existence

and sufficiency of the reasons for such eviction. Both have been leasehold tenants at University Heights since mid-1968 and both were notified that their leases would not be renewed in the Fall of 1971. Their requests for statements of reasons and hearings on the decisions not to renew were refused.

Jurisdiction is asserted under 28 U.S. C. §§ 1331, 1343(3) and 1343(4). The amount in controversy is alleged to exceed $10,000.

A temporary restraining order, entered by consent of the parties, has forestalled the threatened eviction. Plaintiffs have moved for a preliminary injunction.

Defendants have moved to dismiss, arguing (1) that the complaint fails to state a claim on which relief can be granted because they are not acting under color of state law as required by 42 U.S.C. § 1983, and (2) that this Court lacks subject matter jurisdiction because the matter in controversy does not exceed $10,000 and the subject matter of the complaint is solely a property right and not cognizable under 28 U.S.C. § 1343(3) or (4). A hearing was held on both motions.

### Motion to Dismiss

**1. Lack of Jurisdiction**

**A. 28 U.S.C. § 1343(3)**

■ Defendants move to dismiss this action for lack of subject matter juris-

diction under 28 U.S.C. § 1343(3). Urging this Court to adopt the property rights/personal rights jurisdictional distinction of Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969), defendants argue that the only interest at stake here is a tenant's property interest, which under Eisen is not cognizable under § 1343(3).

In Eisen, Judge Friendly affirmed the vitality as law in the Second Circuit of dicta by Mr. Justice Stone in Hague v. C. I. O., 307 U.S. 496, 531, 59 S.Ct. 954, 971, 83 L.Ed. 1423 (1939), that 28 U.S. C. § 1343(3) applied "whenever the right or immunity is one of personal liberty, not dependent for its existence upon the infringement of property rights." Claims involving infringement of property rights, under the Eisen formulation, must meet the $10,000 jurisdictional amount of 28 U.S.C. § 1331 to find protection in federal courts. Eisen thus attempted to rationalize the overlap between two jurisdictional grants to the federal courts, 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). 421 F.2d at 565.

The difficulty of determining what is a personal right rather than a property right was recognized by the Eisen opinion, see 421 F.2d at 565, and has been borne out by the chaotic and inconsistent results flowing from application of the doctrine.[1] The effect seems to amount to a largely unprincipled [2] discretion in federal trial courts to take or deny jurisdiction over civil rights claims difficult to characterize as purely per-

1. For instance, as to cases involving discharge from public employment, compare Tichon v. Harder, 438 F.2d 1396 (2d Cir. 1971), which held the district court lacked 1343(3) jurisdiction over a claim of denial of due process in firing from public employment, with Birnbaum v. Trussell, 371 F.2d 672 (2d Cir. 1966), Meredith v. Allen County War Memorial Hospital Commission, 397 F.2d 33 (6th Cir. 1968), Olson v. Regents of U. of Minn., 301 F. Supp. 1356 (D.Minn.1969), Taylor v. New York City Transit Authority, 309 F.Supp. 785 (E.D.N.Y.1970), aff'd on other grounds 2 Cir., 433 F.2d 665. For an attempt to find some rationalizing principles, see 71 Duke L.J. 635 (1971).

Also, compare Canty v. Board of Education of City of New York, 448 F.2d 428 (2d Cir. 1971), with Brown v. Portsmouth School District, 451 F.2d 1106 (1st Cir. 1971).

2. Eisen itself suggests certain guiding principles: First, the formulation is to be generously construed. Second, civil rights jurisdiction would seem to lie where there is an allegation of purposeful discrimination. 421 F.2d 565. See also Harrison v. Brooks, 446 F.2d 404 (1st Cir. 1971). Third, Eisen does not purport to deal with 28 U.S.C. § 1343(4). Fourth, where there is a mix of personal and property rights, or personal rights dependent on underlying property rights, courts may find jurisdiction. 421 F.2d at 565.

sonal and valued at less than $10,000. While this effect in itself is sufficient to call the application of the doctrine into question, its more serious defect is that certain plaintiffs asserting constitutional rights are denied a federal forum as a matter of questionable statutory interpretation regarding district court jurisdiction. See Note, 43 N.Y.U.L.Rev. 1208 (1968). The ensuing reduction of the burden of § 1983 cases brought into federal court may or may not be a wise one in terms of considerations of federalism, see Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and of judicial economy, see Freeman v. Flake, 448 F.2d 258 (10th Cir. 1971), but cannot, I think, be justified by shaky statutory construction leading to a jurisdictional limitation.

I do not read Justice Stone's opinion in *Hague, supra,* to necessarily lead to the use made of it in *Eisen.* In finding that the right to free speech encompassed by the First and Fourteenth Amendments was a personal right for which jurisdiction existed without regard to amount, Justice Stone was attempting to save § 1343 from being swallowed by § 1331, not vice versa. See Section 1343(3) Jurisdiction and the Personal-Property Right Distinction, 70 Duke L.J. 819, 837. The argument that § 1343 is not swallowed by § 1331 and its jurisdictional amount requirement because rights inherently incapable of valuation may be brought under § 1343 jurisdiction but not under § 1331 jurisdiction need not be turned, as *Eisen* attempted to do, into

an argument that this is the *only* class of cases to be brought under § 1343(3).[3]

Of course, § 1343(3) does not literally "[swallow] entirely the 'arising under the Constitution' part of the predecessor to § 1331," H. Hart and H. Wechsler, The Federal Courts and the Federal System 841, since § 1343(3) applies only to cases involving state action and natural persons. See Snyder v. Harris, 394 U.S. 332, 342–343 n. 2, 89 S.Ct. 1053, 22 L.Ed. 2d 319 (J. Fortas dissenting). Further reason to question the doctrine is found in the fact that the basis for the property rights/personal rights distinction is not evident on the face of § 1343(3). Federico v. Minter, Memorandum Opinion, C.A. 69–1101–J (D.Mass. July 14, 1971); Joe Louis Milk Co. v. Hershey, 243 F.Supp. 351, 354 (N.D.Ill.1965). Nor is it supported by the legislative history of § 1343(3). See Comment, 49 B.U.L.Rev. 377 (1969). Rather, the legislative history evidences an intent to provide protection for property rights under 28 U.S.C. § 1343(3).

The 1871 Ku Klux Klan Act, from which both 42 U.S.C. § 1983 and 28 U.S. C. § 1343(3) came, neither on its face nor in its history indicated there was any distinction to be made in coverage between personal and property rights. See Section 1343(3) Jurisdiction and the Property-Personal Right Distinction, 70 Duke L.J. 819, 835. The Act grew out of a Presidential message to Congress decrying the insecurity of life and property in some states and recommending legislation to "secure life, liberty, and property."[4] In Congressional debate on the bill that was to become the predeces-

---

3. See Mr. Justice Stone's opinion at 307 U.S. 529–530, especially at 530, 59 S.Ct. 954, 971, 83 L.Ed. 1423:
   "  .  .  .  there are suits authorized by § 1 of the Act of 1871 which could be brought under § 24(14) after, as well as before, the amendment of 1875 without compliance with any requirement of jurisdictional amount, and that these *at least* must be deemed to include suits in which the subject matter is one incapable of valuation." (emphasis added)

4. The message was sent to Congress by President Grant on March 23, 1871 and read:
   "A condition of affairs now exists in some States of the Union rendering life *and property* insecure.  .  .  . That the power to correct these evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of *existing laws, is* sufficient for present emergencies is not clear. Therefore, I urgently recom-

sor to § 1343(3), both opponents [5] of the bill and its proponents [6] argued that it would open the federal courts to protection of property rights.

Assuming, as I do, that the 1871 Ku Klux Klan Act intended to give the federal courts jurisdiction to remedy deprivation of property rights, the question is whether Congress intended to curtail that jurisdiction by the terms of the 1875 grant of federal question jurisdiction, now 28 U.S.C. § 1331.

Legislative history on the grant of federal question jurisdiction is sparse indeed. The bill containing the federal question grant was primarily concerned with the removal jurisdiction of the federal courts and little attention was paid to the federal question grant. Perhaps the reason for inclusion of the federal question grant is to be found in the records of the Congressional debate, in the reply of Mr. Carpenter to an attack by Bayard of Delaware. Carpenter argued that the First Judiciary Act of 1789, in failing to give the full scope of judicial power granted by the Constitution, was "substantially in contravention of the Constitution."

"Mr. BAYARD. Is the act of 1789 in contravention of the Constitution?

Mr. CARPENTER. I think it is substantially in contravention of the Constitution, and I will state why. The Constitution says that certain judicial powers shall be conferred upon the United States. The Supreme Court of the United States in an opinion delivered by Judge Story—I do not recollect now in what celebrated case it was, whether Cohens v. Virginia or some of those famous cases—said that it is the duty of the Congress of the United States to vest all the judicial power of the Union in some Federal court, and if they may withhold a part of it they may withhold all of it and defeat the Constitution by refusing or simply omitting to carry its provisions into execution."

2 Congressional Record 4986 (June 15, 1874)

Discussing the lack of attention paid to this new source of jurisdiction, commentators have noted that:

"[C]ontemporary legal periodicals disclose no material either before or after the enactment of the legislation . . . The view that the Act of 1875 was one aspect of a wide general trend of federal legislation is supported by an anonymous writer in the year of its passage, who explains it as the culmination of a movement which began with the removal legislation of 1864 to strengthen the Federal Government against the states."

Frankfurter and Landis, The Business of The Supreme Court, 65.

It would be odd indeed if the federal question jurisdiction, described in its

---

mend such legislation as in the judgment of Congress shall effectually secure life, liberty, *and property,* and the enforcement of law in all parts of the United States." (emphasis added)

Cong. Globe, 42d Cong. 1st Sess. p. 244, quoted in Monroe v. Pape, 365 U.S. 167, 172–173, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

5. " . . . Congress proposes to take charge of those duties which essentially belong to the States, which are indeed the principal duties of States, of vindicating the rights of life, liberty, *and property.*" (emphasis added)

Speech of Hon. W. S. Holman of Indiana of the House of Representatives, Cong. Globe, 42d Cong., 1st Sess., App. 258.

6. " . . . the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States . . . the citizen had no remedy. . . . They took property without compensation, and he had no remedy. Who dare say, now that the Constitution has been amended, that the nation cannot by law provide against all such abuses and denials of right as these in States and by States, or combinations of persons."

Mr. Bingham of Ohio, Cong. Globe, 42d Cong., 1st Sess., App. 85.

legislative history as "vesting the full judicial power of the Union in some Federal court" and by commentators as the culmination of a triumphant federal power over the states, were understood to limit an earlier grant of judicial power designed to secure individual rights against the states.[7]

Reasoning as it does, this Court would find little comfort and much that is troublesome were it to accept defendants' arguments that it is powerless to hear these tenants' claims because they are claims based on property rights. Indeed, there is little comfort to me in any judicially fashioned doctrine that excludes from this Court persons asserting important constitutional rights. However, I do not find it necessary to reach defendants' argument that this Court should accept the *Eisen* doctrine since, even applying *Eisen*, this Court properly has jurisdiction under 28 U.S.C. § 1343 (3).

■ Citation of prior case law would suffice to establish that these plaintiffs raise a claim within the civil rights jurisdiction. See McQueen v. Druker, D.C., 317 F.Supp. 1122, aff'd in part 438 F.2d 781 (1st Cir. 1971). Also, Caulder v. Durham Housing Authority, 433 F.2d 998 (4th Cir. 1970), cert. denied 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971); McMichael v. Chester Housing Authority, 325 F.Supp. 147 (E.D.Pa. 1971).

Rejecting the contention that a tenant who claims a right to "a full, fair and impartial hearing" before eviction merely asserts a property right not within the protection of the Civil Rights Act, a panel in the Second Circuit, including Judge Friendly, who authored *Eisen*, found:

"A tenant's interest in not being evicted is a good deal more 'personal' than a landlord's interest in resisting rent controls, the situation to which [Eisen and Davenport v. Berman, 2 Cir., 420 F.2d 294] were addressed. Indeed, we decided that such an interest is within the protection of the Civil Rights Act implicitly in Holmes v. New York City Housing Authority, 398 F.2d 262 (2 Cir. 1968), and explicitly in Escalera v. New York City Housing Authority, 425 F.2d 853, 864–865 ([2 Cir.] 1970)."

McGuane v. Chenango Court, Inc., 431 F.2d 1189 (2d Cir. 1970), cert. denied 401 U.S. 994, 91 S.Ct. 1238, 28 L.Ed.2d 532 (1971).

Plaintiff in *McGuane* was a tenant in an apartment building constructed with the assistance of federal mortgage insurance under 12 U.S.C. § 1715*l*(d), as are plaintiffs here.

■ Where there are overtones of a deprivation of a substantial personal right mixed with a deprivation of property rights, this Court will take jurisdiction under § 1343(3). Harrison v. Brooks, 446 F.2d 404, 409 (1st Cir. 1971). The right to decent housing at a rent that can be afforded, the right not to be uprooted, the right to stability as a participant in a particular community, and the right to be left alone are all substantial personal rights involved in the instant litigation. See Meyer v. State of Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969); McQueen v. Druker, 317 F.Supp. 1122 (D.Mass.), aff'd in part 438 F.2d 781 (1st Cir. 1970); Cole v. Housing Authority of the City of Newport, 312 F.Supp. 692 (D.R.

---

7. Chadbourne & Levin, Original Jurisdiction of Federal Questions, 90 U.Pa.L.Rev. 639 at 645:

"Consequently, the scene was set for passage of an Act which can be regarded as the 'culmination of a movement . . to strengthen the federal government against the states.' Therefore, even if this tremendous broadening of the scope of the Federal judiciary came about through legislation consented to by a Congress not fully aware of the meaning of its action, yet, it is patent that the Act is intelligible in terms of the political and economic background of its time, and clearly is part of, rather than an exception to, the trend of legislation which preceded it."

I.) aff'd 435 F.2d 807 (1st Cir. 1970); Michelman, The Advent of a Right to Housing: A Current Appraisal, 5 Harv. C.Rights C.Lib.L.Rev. 219 (1970). The worth of such rights to a tenant is insusceptible of pecuniary valuation. .

B. *28 U.S.C. § 1343(4)*

■ ■ Defendants also claim that this Court lacks jurisdiction under 28 U.S.C. § 1343(4). This section is a jurisdictional grant to district courts.

> "(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

It is clear that 42 U.S.C. § 1983 is an "Act of Congress providing for the protection of civil rights" under 28 U.S.C. § 1343(4). York v. Story, 324 F.2d 450 (9th Cir. 1963). See Rosado v. Wyman, 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), Jackson v. Bishop, 404 F.2d 571, 573 (8th Cir. 1968). The complaint here indicates a denial of due process by conduct of defendants which constitutes state action and is sufficient to support § 1343(4) jurisdiction. Brown v. Strickler, 422 F.2d 1000 (6th Cir. 1970). Further, jurisdiction under § 1343(4) is not dependent on a finding of jurisdiction under § 1343(3):

> "Although there may be some dispute about the applicability of 28 U.S. C.A. § 1343(3), there can be no doubt that § 1343(4) is applicable and the complaints were encompassed in § 1343(4) whether cited specifically or not. Certainly § 1983 is an 'Act of Congress providing for the protection of civil rights, including the right to vote.' Gomez v. Florida State Employment Service, 5 Cir. 1969, 417 F.2d 569, 580 n. 39."
> Hall v. Garson, 430 F.2d 430, 438 (5th Cir. 1970).

*Eisen* notes § 1343(4) has been called "merely technical [amendments] to the Judicial Code so as to conform it with amendments made to existing law by the preceding section of the bill" (amendment to 42 U.S.C. § 1985) Pub.L. 85–315,

1957 U.S. Code Cong. and Admin. News p. 1976, "but by its letter might be considerably more than that. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 412 n. 1, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Allen v. State Board of Elections, 393 U.S. 544, 554, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)." 421 F.2d at 562.

I find § 1343(4) to be on its face a jurisdictional grant independent of § 1343(3) and find that this Court also has jurisdiction under § 1343(4).

C. *28 U.S.C. § 1331*

Because I hold that jurisdiction exists under 28 U.S.C. § 1343, I do not reach the question of whether the matter in controversy here can be valued at $10,000 in order to establish jurisdiction under 28 U.S.C. § 1331.

2. *State Action*

■ Defendants argue that there is insufficient state involvement to meet the requirements of 42 U.S.C. § 1983 and that the action must be dismissed. They contend that the factual posture of University Heights is sufficiently different from that of Castle Square, the 221(d) (3) housing project involved in McQueen v. Druker, *supra*, to distinguish *McQueen*'s finding of state action.

Straining to find cohesive logical strands in the nebulous doctrine of state action, I find no better source of guidance for this case than Judge Coffin's sensitive opinion in *McQueen*, which held:

> "Mere receipt of financial subsidy and subjection to some regulation are the conditions of much of our societal life. Neither factor—or both together—is dispositive of 'state action'. But, while we disavow any effort to be definitive, we conclude that at least when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that generally accorded an independent

contractor, the coloration of state action fairly attaches."

· 438 F.2d at 784, 785.

The factors in the financing and management of Castle Square on which *McQueen*'s finding of state action rested are as follows: 1) defendants bought the property from the city redevelopment authority, which had condemned it in connection with its urban renewal program; 2) FHA mortgage insurance for mortgage loans up to 90% of the project's cost; 3) supplementation of mortgagor's interest payments above 3%; 4) assurance of a 6% return on investments through rent adjustments; both 5) federal and 6) state laws require that urban renewal property be disposed of in accordance with approved urban renewal plans or for low or moderate income housing; the Land Disposition Agreement between the B.R.A. and the landlord required 7) prior approval for construction, improvements and demolition; 8) a minimum investment in works of art; 9) facilities for the handicapped; 10) equal employment opportunity; limitations on 11) rental agreements as to amounts, duration, and increases; 12) admissions policies; 13) management; 14) transfer of title. The substance of these factors exists in the instant case.

While defendants argue they are not guaranteed a 6% return on investments, they do not claim to be, and are not, in a different position than Castle Square on this matter. This argument is thus foreclosed by *McQueen*. Although there is no evidence that University Heights participates in any leased housing program with the local housing authority or is required to invest in works of art, the other factors present in *McQueen* are abundantly present here.

The tax treatment of University Heights substantially comports with that of Castle Square in *McQueen*. University Heights is assessed on the basis of 12% of gross income, the lowest basis for multi-family units used in Providence. Further, it is evaluated by a capitalization of income method designed to produce a lower valuation than the cost method would yield. This capitalization of income method, in the opinion of the current City Assessor, was intended to encourage the construction of multi-unit dwellings. As applied to University Heights, the capitalization of income method takes account of both a 10% return on investment and a 5% vacancy rate, which might be adjusted should vacancies exceed 5%. See *McQueen, supra*, at 783–784 n. 6.

The story of University Heights revealed by the evidence is one of sinewy intertwinings of federal and state assistance and control to give strength to University Heights'\ financial position while accomplishing the public purpose of construction of low- and moderate-income housing. See *McQueen, supra*, at 784.

The property on which University Heights is located was acquired by the Providence Redevelopment Agency (P.R.A.) by eminent domain pursuant to an urban renewal plan for the Lippitt Hill Project. The Lippitt Hill Redevelopment Plan, adopted by city ordinance and pursuant to state law, required that land in the project area be disposed of only in accordance with the terms and purposes of the Plan. The property was sold to University Heights, Inc., subject to the urban renewal plan under a Land Purchase and Redevelopment Agreement. This agreement required University Heights to provide equal employment opportunity and not to discriminate in the residential use of the property. The P.R.A. maintained rights of reentry and reverter.

In accordance with § 6(a) of this land purchase agreement,[8] University Heights applied for mortgage insurance under sections 220 and 221(d) (3) of the National Housing Act, as amended, 12 U.S.

---

8. See Note, Judicial Review of Displacee in Relocation in Urban Renewal, 77 Yale L.J. 966 (1968). Also Western Addition Community Organization v. Weaver (WACO), 294 F.Supp. 433 (N.D.Cal.

1968); Note, Urban Renewal: Problems of Eliminating and Presenting Urban Deterioration, 72 Harv.L.Rev. 504, 531 (1969).

C. § 1715*l*(d) (3).[9] University Residences, Inc., a limited dividend corporation, received § 221(d) (3) insurance and entered into regulatory agreements with the Federal Housing Administration (F.H.A.).

The lengthy regulatory agreements between University Heights and the F. H.A. require the landlord to adhere to F.H.A. set standards that govern the construction, improvement, and demolition of the physical plant; transfer and disposition of the property; the amount, duration, and increases of rental agreements; and admissions policies (income levels of applicants; priority to four classes of displaced persons). The landlord must provide equal employment opportunity and facilities for the handicapped. Management is under F.H.A. supervision and control, with the F.H.A. retaining a right to possession for breach of the agreement.

An indication of the control exerted by the government on University Heights' managerial freedom is given by the following restrictions: it may not engage in any other business or contract for management services; it may not disburse more than 6% on the equity investment or go into bankruptcy; it must allow the F.H.A. to inspect its property and records at all reasonable times.

With the following few observations, I would defer any further discussion of the relevant legal principles to the discussion of applicable Supreme Court precedent on "state action" found in *McQueen*, 438 F.2d at 784–785. Municipal, state, and federal governments have put this landlord in the position to do what he does. This is not a situation of unwarranted interference with authentically private life. Landlord-tenant relations are an area well known to prior law and it could not be astounding to this landlord's expectations to find he is subject to legal regulation regarding evictions. See Black, Foreword: "State Action," Equal Protection and California's Proposition 14, 81 Harv.L.Rev. 69 at 102.

I find that there is sufficient governmental involvement with University Heights in terms of subsidization and control and that University Heights sufficiently carries out a specific governmental function to warrant application of the Fourteenth Amendment to this landlord's actions. McQueen v. Druker, *supra*; Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970); Leslie v. Philadelphia 1976 Bicentennial Corporation, 332 F. Supp. 83 (D.Pa.1971); Colon v. Tompkins Square Neighbors, 294 F.Supp. 134 (S.D.N.Y.1968). Cf. Male v. Crossroads Associates, 320 F.Supp. 141 (S.D.N.Y. 1970); McGuane v. Chenango Park, 431 F.2d 1189 (2d Cir. 1970).

*Preliminary Injunction*

Granting of preliminary relief involves consideration of

"The relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury allegedly flowing from denial of preliminary relief, the probability of the ultimate success or failure of the suit, the balancing of damage and convenience generally."

Embassy Dairy v. Camalier, 93 U.S. App.D.C. 364, 211 F.2d 41, 43 (1954) Here, the balance of hardships weighs in plaintiffs' favor. At stake for these tenants is decent housing at a rent they can afford and the stability of their homelife. So long as University Heights continues to receive rent from plaintiffs, the damage this landlord will suffer from issuance of a preliminary injunction is minimal. See Continental Oil v. Frontier Refining, 338 F.2d 780 (10th Cir. 1964).

Plaintiffs have raised substantial constitutional questions as to the rights of tenants in 221(d) (3) housing to due process protections before termination of their tenancies. See Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25

9. For general discussions of § 221(d) (3) housing, see Bartke, Fannie Mae and the Secondary Mortgage Market, 66 N.W.U.L. Rev. 1 (1971); Note, Governmental Housing Assistance to the Poor, 76 Yale L.J. 508 (1967).

L.Ed.2d 287 (1970); Caulder v. Durham Housing Authority, 433 F.2d 998 (4th Cir. 1970). At least one court has held that tenants in 221(d) (3) housing have rights to the permanent relief sought here. McQueen v. Druker, 317 F.Supp. 1122 (D.Mass.1970). Plaintiffs are entitled to preliminary injunctive relief.

It is hereby ordered that defendants' motion to dismiss is denied and a preliminary injunction is entered pending final judgment against defendants restraining them, their agents, employees or successors from evicting or taking any action whatever to evict the named plaintiffs from their respective residences in the University Heights project.

The Court realizes the broad nature of this injunction and finds it necessary in order to preserve the status quo. The question of the appropriate mechanism for hearings is reserved until resolution of the main issues. Should circumstances alter the status quo such that reason for eviction exists outside of the scope of this opinion, this Court will entertain a motion for relief from this Order under Rule 60(b) (6), Fed.R. Civ.P.