Kevin A. McKENNA and Marlene
Marcello McKenna

v.

Charles T. REILLY, Chairman of the
Democratic State Committee, et al.

Civ. A. No. 76–0280.

United States District Court,
D. Rhode Island.

Sept. 13, 1976.

John M. Roney, Richard Jessup, Jr., Providence, R. I., for plaintiffs.

Milton Stanzler, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

Plaintiffs in this action for declaratory and injunctive relief are a declared and qualified candidate for nomination by the Democratic Party of the State of Rhode Island to the office of Lieutenant Governor, and a qualified elector who is a member of the Democratic Party of the State of Rhode Island. Plaintiff Kevin McKenna, the nominee, has not been endorsed by the Democratic State Committee. Defendants are the Democratic State Committee, the chairman and treasurer of the Democratic State Committee, and Thomas DiLuglio, a candidate for the Democratic nomination to the office of Lieutenant Governor who has re-

ceived the endorsement of the defendant Committee.

Section 44–30–2(e) (1975 Supp.) R.I.G.L., entitled "An Act Providing a Credit Against State Income Tax for a $1.00 Political Contribution", permits a credit of one dollar against the Rhode Island personal income tax otherwise due.[1] Each taxpayer is permitted to designate a political party, or a non-partisan general account, to receive his or her contribution.[2] The state general treasurer must distribute the designated partisan contributions to the chairmen of the parties by September 1 of each year. He must also distribute the non-partisan general fund to the party chairmen under a formula not at issue here.[3] The statute is silent as to the purposes for which the parties receive these funds, and as to how the funds are to be spent. No special accounting of the disbursal of these funds is required.[4]

Plaintiff complains that defendants have allocated these "checkoff moneys" to endorsed candidates, including his endorsed opponent, to the exclusion and harm of unendorsed candidates running in the September 14 Democratic primary.[5] He challenges the constitutionality of this practice, arguing that defendants' actions constitute governmental action assisting his opponent, and hindering his own candidacy, in violation of his rights of political expression under the First Amendment and equal protection as guaranteed by the Fourteenth Amendment. He seeks a declaration that the practice is illegal, and an injunction prohibiting defendants from providing, and defendant DiLuglio from spending, check-off moneys for DiLuglio's compaign.

This action comes before the court on plaintiff's motion for a preliminary injunction, and defendant's motion to dismiss. Defendants argue (1) that the court does not have jurisdiction pursuant to 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 because none of the defendants are state officers as required by 42 U.S.C. § 1983, and (2) that the complaint fails to state a claim on which

---

1. R.I.G.L. § 44–30–2(e) (1971 ed., Supp.1975) reads as follows:

 "(e) There shall be allowed as a credit against the Rhode Island personal income tax otherwise due for a taxable year, a contribution of one dollar ($1.00), or two dollars ($2.00) if married and filing a joint return, to a political party as defined in § 17–12.1–14 of the general laws, designated by the taxpayer or to a non-partisan general account if indicated. The credit for the political contribution shall appear on the face of the state personal income tax return. The tax administrator shall annually forward by August 1, all political contributions to the state general treasurer and the treasurer shall annually remit by September 1, the designated partisan contributions to the chairman of the appropriate political party and the contributions made to the non-partisan general account shall be allocated by the state general treasurer to each such political party in proportion to the combined number of votes its candidates for general offices received in the previous election, after five per cent (5%) of the amount in the account is allocated to each such party for each general officer elected in the previous statewide election."

 There is no legislative history available for this section, enacted in 1973 and now codified in the Personal Income Tax title of the Rhode Island General Laws.

2. Rhode Island law defines a political party as "any political organization which at the preceding general election nominated a candidate for governor and whose candidate for governor at said election polled at least five per cent (5%) of the entire vote cast in the state for governor." R.I.G.L. § 17–12.1–14(A) (1970 ed., Supp.1975). Since the enactment of R.I.G.L. § 44–30–2(e), only the Democratic and Republican parties have received any state funds. No question has been raised in this case regarding the constitutionality of dispersing funds to parties as defined by Rhode Island law, and the court indicates no opinion as to these matters. *But see Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

3. *See* R.I.G.L. § 44–30–2(e).

4. Candidates and parties are required to file periodic reports of all contributions and expenditures under a statutory scheme not at issue here. R.I.G.L. § 17–25–14 (1970 ed., Supp.1975).

5. Each party is authorized by law to endorse candidates for state-wide office. R.I.G.L. § 17–12–4 (1970 ed.). The endorsed candidate is listed in the first column of the ballot and marked with an asterisk. R.I.G.L. § 17–15–8 (1970 ed.). *See Gallant v. LaFrance*, 101 R.I. 299, 222 A.2d 567 (1966). No challenge is here raised to these provisions.

relief can be granted because the defendants are not acting under color of state law as required by 42 U.S.C. § 1983.

## LACK OF JURISDICTION

■ Jurisdiction is proper under 28 U.S.C. § 1343(3). Plaintiffs need not allege that defendants are state officers; they need merely allege, as they have here, that the acts complained of were accomplished under color of state law. *See McClellan v. University Heights, Inc.,* 338 F.Supp. 374 (D.R.I.1972).

## STATE ACTION

■ Defendants insist that plaintiffs' constitutional claim must fail at the threshold because the protections of the equal protection clause only come into play where invidious discrimination is undertaken by the state. They contend that the state's involvement in the distribution of checkoff moneys ends when the funds are given to the party chairman, and that a party may thereafter spend its money in any way it pleases. Indeed, defendants argue, for the state to interfere in the management of party affairs by directing how party money should be spent would perhaps violate the party's First Amendment rights.[6]

■ In determining whether or not there is sufficient state action to trigger the equal protection clause in any given case, courts must inescapably reach ultimate conclusions by "sifting facts and weighing circumstances", *McQueen v. Druker,* 438 F.2d 781, 783 (1st Cir. 1971), citing *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In this weighing, the court must give due consideration to the nature of the activity into which the state is claimed to have introduced itself. *McClellan v. University*

*Heights, supra.* Where, as here, the electoral process is involved, particular sensitivity to state intrusion is required. *Fahey v. Darigan,* 405 F.Supp. 1386 (D.R.I.1975); *Nixon v. Condon,* 286 U.S. 73, 88, 52 S.Ct. 484, 76 L.Ed. 984 (1932).

■ The factors the court must weigh in reaching its determination include the degree of governmental subsidization, the degree of governmental control, and the extent to which the government has vested its functions in private hands. *McClellan v. University Heights, supra; McQueen v. Druker, supra; Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Nixon v. Condon, supra.*

■ Defendants argue that the mere furnishing of state-provided funds does not transform the recipient's actions into the actions of the state, citing *Grossner v. Trustees of Columbia University,* 287 F.Supp. 535 (S.D.N.Y.1968) (university, a recipient of state funds, not bound by Fourteenth Amendment in student discharge proceedings); *Greenya v. George Washington University,* 512 F.2d 556 (D.C.Cir. 1975) (university, recipient of state funds, not bound by Fourteenth Amendment in teacher discharge proceedings.)

The court agrees with the principle, but finds defendants' reliance on these cases to be misplaced. In the case at bar, plaintiff does not argue that defendants are subject to the prohibitions of the Fourteenth Amendment in all their party activities merely because they receive state funds. Plaintiff does contend, however, and the court agrees, that insofar as a political party spends state-allocated funds for the benefit of endorsed candidates, to the detriment of unendorsed candidates, a much stronger case of state action is made than in either *Grossner* or *Greenya, supra.*[7]

---

6. There is no challenge to the facial constitutionality of R.I.G.L. § 44–30–2(e). Plaintiff complains that defendants are acting unconstitutionally through a misreading of the statute. No three-judge court is therefore required in this case. *See Phillips v. United States,* 312 U.S. 246, 251–252, 61 S.Ct. 480, 85 L.Ed. 800

(1941); *Ex parte Bransford,* 310 U.S. 354, 361, 60 S.Ct. 947, 84 L.Ed. 1249 (1940).

7. *Compare Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968), where the Second Circuit held that receipt of state funds did not transform a private college's unrelated actions into state actions, but that state funds used directly for discriminatory practices by trustees would fall within

The court must next assess the degree of state regulation, or control, to which private defendants are subject. *McClellan, supra.* Precisely what degree of control suffices is not evident from the cases, *McQueen, supra,* at 783, and varies according to circumstances. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350–51, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). It seems clear that, in the "sifting facts and weighing circumstances", the court must also consider whether a private party is engaged in carrying out a public function at the behest of the government. *Evans v. Newton, supra.*

Rhode Island comprehensively regulates the activities of parties with regard to primary elections. Parties are required to nominate candidates for state-wide office in a primary election run by the state, R.I.G.L. § 17–15–7.[8] Each party is authorized to endorse candidates for statewide office, and such endorsement appears on the ballot as of right, §§ 17–12–4, 17–15–8. *See Gallant v. LaFrance,* 101 R.I. 299, 222 A.2d 567 (1966). Each party is also required to disclose contributions periodically, § 17–25–7. Party campaign funds may only be disbursed by a properly designated party campaign treasurer, § 17–25–9, who must fill out mandated reports, § 17–25–11. The Democratic state committee is authorized to receive and disburse moneys "for the general purposes of maintaining such organization during the whole or any part of the year," § 17–25–14. Again, while this scheme of regulation is not sufficient of itself to bring the disbursement of party funds to endorsees within the ambit of the equal protection clause, *Fahey v. Darigan, supra, Gallant v. LaFrance, supra,* the court must consider in the overall equation this

extensive involvement of the state in regulating and controlling the conduct of the party's activities.

A long line of Supreme Court cases touches on the question whether a political party engages in a public function in the internal functioning of its affairs. Certainly the strongest such case is presented when the activity in question is the nomination of the party's candidates for office. *See Moore v. Ogilvie,* 394 U.S. 814, 819, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Gray v. Sanders,* 372 U.S. 368, 374, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). The primary has been held to be an integral part of the election process. *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). It is true, as defendants point out, that the activity complained of here leaves each voter free to vote for unendorsed candidates, and to make political contributions to unendorsed candidates. Defendants contend that party activity which does not result in total exclusion of a candidate from the electoral process cannot be attributed to the state. The court rejects that argument. The restriction of the unendorsed candidate's ability to run for office here is partial, and may therefore be judged by a less strict standard of equal protection review than the ballot access cases, *Buckley v. Valeo, supra,* 424 U.S. at 94–95, 94 S.Ct. 612. Nevertheless, where, as here, state law requires a party to nominate its candidates by primary; extensively regulates the party; permits and gives value to the endorsement of primary candidates; and provides an extensive subsidy to the party, presumably for the purpose of defraying the costs of the state-imposed primary,[9] the court believes that a party's

the Fourteenth Amendment prohibitions. *See also Poindexter v. Louisiana Financial Assistance Commission,* 275 F.Supp. 833, 835, 854 (D.La.1967), affirmed, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).

8. Unless otherwise indicated all statutory citations in this opinion are to the Rhode Island General Laws (R.I.G.L.) (1970 ed., Supp.1975).

9. Since the state is not a party to this action, the court does not have the benefit of an authoritative explanation of the governmental interest served by the tax checkoff involved here. The Supreme Court upheld a party funding scheme in *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), where state funds were used to defray the costs of a primary election required by the state. There was no contention in *American Party* that the funds were used to benefit par-

actions in disbursing money derived solely from public subsidy to its candidates can fairly be called state action.

The court is not aware of any other decided cases dealing with the precise question presented here.[10] All courts considering related issues, however, have observed that state regulation and, *a fortiori*, subsidization of the political process requires the most critical scrutiny under First Amendment and equal protection principles. *Buckley v. Valeo, supra*, 424 U.S. at 14–15, 96 S.Ct. 612. *See also Stanson v. Mott*, 17 Cal.3d 206, 130 Cal.Rptr. 697, 704–05, 551 P.2d 1 (1976). There are vital state interests which legislatures may properly seek to further through legislation; but "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley v. Valeo, supra*, 424 U.S. at 15, 96 S.Ct. at 632, citing *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). In the First Amendment area of political rights, "precision of regulation must be the touchstone." *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).[11] It is not surprising that the election financing and reform statutes upheld by the Supreme Court in recent years have been carefully drawn, reflecting clear legislative judgments.[12]

By contrast, the statute under which defendants receive public funds provides no guidance as to the purpose for which the money is provided, or the purposes for which it may be spent. Instead, these decisions are effectively delegated by the state to party chairmen. R.I.G.L. § 44–30–2(e). In this context, such delegation of legislative responsibility is precisely the "entangling" and "intertwining" which courts, in another especially sensitive area, have found to constitute state action. *Burton v. Wilmington Parking Authority, supra*.

In effect, the party chairman has been deputized by the state to spend, without any principle to guide him, what the statute calls a "political contribution." Under defendants' theory of state action, such checkoff moneys allocated by the state could be used invidiously to favor candidates on the basis of race, or political belief, so long as the state claimed not to know what happened to the moneys after delivery to the party chairman—indeed, even if the state was aware that the money was being so spent. No claim has here been made, and the record would not support any inference, that that has occurred here. But this court would be most reluctant to adopt a theory of state action which would, in effect, immunize the state's regulation and subsidization of the political process from the mandate of First Amendment and equal protection principles. The Constitution demands more. The state must insure that public funding of the political process does not " 'operate to give an unfair advantage to established parties, thus reducing, to the nation's detriment . . . the "potential fluidity of American political life".' "

ticular candidates; it appears from the record that the funds were used for general operating expenses.

Similarly, the Court upheld the Congressional statute funding party conventions in *Buckley v. Valeo, supra*. But the federal statute in *Buckley* forbids the use of funds allocated to the party "to defray the expenses of any candidate;" the funds can only be used for the party's general convention expenses. 26 U.S.C. § 9008(c) (1970 ed., Supp. IV).

**10.** The state action question was easily resolved in *Buckley v. Valeo, supra*, since the federal campaign finance law directed the precise allocation of funds. Defendants in *Buckley* were the Secretary of the Senate and the Clerk of the House of Representatives. *See*

*also American Party of Texas v. White, supra*, (facial attack on statute against defendant state officials.)

**11.** *Cf. Hadnott v. Amos*, 394 U.S. 358, 364, 89 S.Ct. 1101, 1104, 22 L.Ed.2d 336 (1969), where the Court said: "We refuse to accept a reading of an Act which gives such . . . discretionary authority to election officials as to cause Fifteenth and First Amendments rights to be subject to disparate treatment."

**12.** *See, e. g., Buckley v. Valeo, supra; Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *American Party of Texas v. White, supra*.

*Buckley v. Valeo, supra,* 424 U.S. at 97, 96 S.Ct. at 672, citing *Jenness v. Fortson, supra,* 403 U.S. at 439, 91 S.Ct. 1970. The state's delegates are subject to those same strictures. *Cf. Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed.2d 987 (1944); *Nixon v. Condon, supra.*

Certainly the state could not directly allocate public funds to some primary candidates, and not to others, by the differentiating principle of party endorsement. The record in this case shows that endorsement depends on a candidate's political beliefs, among other criteria. As Justice Cardozo observed in determining that the arguably private actions of a political party were subject to the mandate of the Fourteenth Amendment, party officials invested with the authority of the state.

" . . . are not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions . . . The test is not whether the members of the executive committee are the representatives of the state in the strict sense of which an agent is the representative of his principal. The test is whether they are to be classified as representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action." *Nixon v. Condon, supra,* 286 U.S. at 88, 89, 52 S.Ct. at 487.

In light of the extensive regulation and subsidization of the Democratic party in the case at bar, the court finds that the party is under the mandate of the Fourteenth Amendment insofar as it allocates public funds directly to certain of its candidates. Defendants' motion to dismiss for failure to state a claim under 42 U.S.C. § 1983 is denied.

## LIKELIHOOD OF SUCCESS ON THE MERITS

Having determined that plaintiffs have alleged sufficient state action to invoke the protection of the Fourteenth Amendment, the court is next faced with the question of whether the defendants, as surrogates for the state, have violated plaintiffs' right to equal protection of the laws. At the preliminary injunction stage, plaintiffs must show a likelihood of success on the merits in order to be entitled to relief. *Jones v. National Collegiate Athletic Association,* 392 F.Supp. 295 (D.Mass. 1975).

In a case of first impression such as this, likelihood of such success is difficult to predict. The place to begin is with the Supreme Court's recent analysis of the federal election financing scheme in *Buckley v. Valeo, supra.*

The *Buckley* plaintiffs claimed, *inter alia,* that the federal election law violated the Fifth Amendment by invidiously discriminating among political parties. The Court considered plaintiffs' arguments as they related, respectively, to the financing of the general election campaign, the party nominating conventions, and the primary election. Precisely what standard of equal protection review the Court used is not clear, but the test appears to be more exacting than traditional "minimum rationality". *Buckley v. Valeo, supra,* 424 U.S. at 293, 96 S.Ct. 612 (Rehnquist, J., concurring and dissenting); *Id.* at 95–96, 96 S.Ct. at 760 (per curiam). The Court identifies the "important" or "vital" governmental interest sought to be furthered, and decides whether the means Congress chose to further the interest were within a range of choices reasonably calculated to advance the interest. The last stage of the analysis requires the Court to ask whether the government has "unfairly or unnecessarily burdened the political opportunity of any party or candidate." *Buckley v. Valeo, supra* at 96, 96 S.Ct. at 671. The last stage, relevant to the present inquiry, can be rephrased as fol-

lows: is the different manner in which different candidates are treated invidious, or is it justified by an important governmental interest.

The federal law at issue in *Buckley* provided larger, equal sums for the candidates of major parties; used prior vote levels as the criterion for pre-election funding to candidates of other parties, and denied all funds to parties receiving less than 5% of the vote. The Court justified the disparate treatment of the major parties in part on the ground that, historically, no third party had posed a credible threat to the major parties since 1860.[13] The Court found that the Congressional plan furthered the "interest in not funding hopeless candidacies", and that such an interest "necessarily justifies withholding of public assistance from candidates without significant public support." 424 U.S. at 96, 96 S.Ct. at 671. In deciding that the different treatment accorded non-major parties did not constitute invidious discrimination, the Court relied heavily on the countervailing advantages which the non-majors received: new parties were freed from the spending ceiling imposed on the major party candidates, and the position of minor party candidates was also relatively enhanced.[14]

Measuring the practice of defendants against these standards, major differences are apparent. It is not at all clear that distributing funds to endorsed party candidates, and not to unendorsed candidates, can be said to further any important governmental interest. If it is suggested that the difference in treatment accorded endorsed and unendorsed candidates is the interest which justified the federal difference in treatment between major and minor parties—that is, the interest in not funding hopeless candidacies—the answer is that the line drawn here cannot be said rationally to further the end. First, as a historical matter, endorsed candidates in Rhode Island are not nearly as invincible as the presidential candidates of the Democratic or Republican parties.[15] Second, there is no evidence that the decision to endorse is made by separating out the hopeless candidacies from the rest.[16] To the contrary, the evidence presented at the hearing disputes such a contention. Defendant Reilly's testimony was to the effect that the party itself had no guidelines for endorsement, but that individual committee members tended to consider, among other unidentified factors, prior party activities, experience and background, and stands on the issues.

**13.** The Court discounted the exception posed by the Progressive Party in 1912. 424 U.S. at 98 n. 32, 96 S.Ct. 612.

**14.** The Court observed:
"[A]ppellants have made no showing that the election funding plan disadvantages nonmajor parties . . . . [B]y our holding today new parties are freed from any expenditure limits . . . But since any major-party candidate accepting public financing of a campaign voluntarily assents to a spending ceiling, other candidates will be able to spend more in relation to the major-party candidates. The relative position of minor parties that do qualify to receive some public funds because they received 5% of the vote in the previous Presidential election is also enhanced. Public funding for candidates of major parties is intended as a substitute for private contributions; but for minor party candidates such assistance may be viewed as a supplement to private contributions since these candidates may continue to solicit private funds up to the applicable spending limit. Thus, we conclude that the general elec-

tion funding system does not work an invidious discrimination against candidates of non-major parties." 424 U.S. at 98–99, 96 S.Ct. at 673.
Similarly, in *American Party of Texas v. White, supra*, the Court justified the exclusion of minor parties from primary election funding on the ground that such parties were freed from the requirement imposed on major parties to hold primaries. 415 U.S. at 793–794, 94 S.Ct. 1296.

**15.** The court takes judicial notice that at least two major offices in Rhode Island are presently held by unendorsed victors of primary campaigns. Senator Claiborne Pell was unendorsed in the Democratic senatorial primary in 1960, and Representative Edward P. Beard was unendorsed in the Congressional primary in 1974.

**16.** It is irrelevant that a candidate may be more likely to win a primary *after* endorsement, since that advantage would accrue to whomever was endorsed.

Of equal importance, the court can find no countervailing benefit accruing to non-endorsed candidates which would correspond to the freedom from contribution limits provided nonmajor candidates in the federal plan.[17] The endorsed candidate does not give up anything when he accepts checkoff moneys from the party chairman, acting for the state; and the unendorsed candidate's position is in no way "relatively enhanced," *Buckley v. Valeo, supra,* 424 U.S. at 98–99, 96 S.Ct. 612.

For the reasons detailed above, the court finds that the allocation of checkoff moneys to endorsed candidates, and not to unendorsed candidates, furthers no important governmental purpose. If the governmental interest asserted were the interest in not funding hopeless candidacies, the court would find that the distinction between endorsed and unendorsed candidates is not rationally related to the end. In either case, the court can only conclude that the provision of checkoff funds to endorsed, and not to unendorsed candidates, works an invidious discrimination against nonendorsed candidates in violation of the equal protection clause.

### IRREPARABLE HARM

■ Whatever the likelihood of success, an injunction may not issue without a showing of irreparable injury. *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974). Although it is the threat of future harm, uncompensable by a later award of monetary damages, which must be the court's focus, facts of past harm are relevant in assessing the probability of continuing harm.

■ The evidence before the court does not show any substantial harm which has accrued to plaintiff from defendants' actions in spending checkoff funds to this date. Uncontradicted testimony before the court indicates that no state checkoff money has been expended on behalf of plaintiff McKenna's endorsed opponent, DiLuglio, for telephone service; bumper stickers, balloons, billboards, or other paraphernalia with the candidate's name;[18] media time; purchase, rental, or other use of motor vehicles; or for any sort of loan or grant.

The sum and substance of the goods and services made available to plaintiff's endorsed opponent, out of more than $82,000 received by the party chairman in state checkoff funds, has been: (1) the rental value of one room in Democratic Party Campaign Headquarters, worth $539.00 for the three months it will be occupied by defendant DiLuglio; (2) the services of party employees in drawing up a list of events, estimated three hours of work;[19] (3) a rally costing $715.00 held at the opening of Democratic Party Campaign Headquarters to which all endorsed candidates running in the state were invited (over 150 other endorsees beside defendant DiLuglio); (4) five copies of a single sheet made by DiLuglio on the party's xerox machine; and (5) a computerized cross-index of all registered voters by telephone number.[20]

The uncontradicted evidence shows that defendant state committee has no plan to

17. *See* n. 14, *supra,* and accompanying text.

18. Testimony did show that two or three posters of endorsed candidates, including defendant DiLuglio, were hung in the window of the state committee's campaign headquarters, which was rented in part with checkoff funds. Given the court's conclusion that the acceptance of checkoff funds does not transform all of the party's activities, including endorsement, into state action, the hanging of these posters can be considered *de minimis.*

19. It was unclear from the testimony whether this list was prepared and made available to defendant DiLuglio's campaign once, or weekly throughout the late summer. The court does not consider the difference significant in its analysis.

20. Without deciding the matter, the court has some doubt that this list was provided to defendant DiLuglio with checkoff moneys. The evidence showed that DiLuglio was billed $500.00 for the service, which he has paid. On the other hand, as plaintiff observes, the cost of the service to plaintiff would be $3180.00: defendant's cost was less because the party, which had purchased the computer services, duplicated the list, provided it to endorsees for other offices, and split the cost six ways.

put on a rally or demonstration of any kind for endorsed candidates before the primary on September 14, 1976. The court would be unwilling to find that the continuation of the activities listed above between now and the primary would constitute irreparable harm.

Plaintiff strenuously argues that the threat of irreparable harm is shown by defendant Reilly's statement that "if there were sufficient funds, I would make expenditures for endorsed candidates," and the recent receipt by the state committee of $60,929.12 from the non-partisan checkoff fund. (Approximately $22,000.00 from the Democratic checkoff fund was previously received on August 17, 1976). Defendants counter that Reilly also testified that he did not expect to make any further expenditures for endorsed candidates out of checkoff moneys before the September 14 primary because the party had insufficient funds to meet its priority expenses.[21]

The court notes that the expenditures which have already been made on behalf of defendant DiLuglio from checkoff funds were one-time expenses and were made prior to the filing of the motion for temporary injunctive relief and are not continuing at present. Counsel for the defendants represented to the court, at a hearing held on September 8, 1976, that no checkoff funds would be expended on behalf of endorsed candidate DiLuglio before the court announced its decision on September 13, a day before the primary. There is no evidence that defendants have reserved any media time for the evening of September 13. Indeed, there is no evidence that, even if defendants were so inclined, they could spend checkoff moneys between the court's decision and the primary to plaintiff's injury.[22]

With the case in this posture, on the basis of defense counsel's prior representation, the court has no alternative but to decline to issue the requested injunction. Plaintiff has failed to show sufficient threat of irreparable harm to prevail. The court, of course, does not rule on whether irreparable harm would have been made out in a case where plaintiff could show that defendants were about to provide checkoff moneys to endorsed candidates for office rental, rallies, computer expenses, or any of the other expenditures detailed above.

■■■■ In light of the showing made, plaintiff is entitled to a declaration that the actions of the defendants in using money received pursuant to § 44–30–2(e) to promote and assist the candidacy of persons endorsed by them, while denying such assistance to other legally qualified but unendorsed candidates for the nomination of the Democratic Party, violate the rights of those unendorsed candidates and their supporters to equal protection of the laws and to free political expression as guaranteed by the First and Fourteenth Amendments to the Constitution.[23] The motion for injunctive relief is denied.

---

21. The court received extensive testimony regarding the party's accounts payable. As of August 18, 1976, the $22,000.00 installment of checkoff funds was completely committed to repaying party debts. The evidence showed that repaying debts was the party's first priority, but did not show that such debts would consume the second installment of over $60,000.00.

22. The court feels constrained to comment on what it perceives to be the unfortunate fact that it must rule on such difficult and vital matters in such a hurried way. This action was instituted on July 19, 1976; plaintiff failed to move for a temporary restraining order until September 7, only seven days before the primary.

23. Although plaintiff has not shown sufficient threat of future harm to entitle him to preliminary injunctive relief, the court is satisfied, on the basis of the evidence before it, that this controversy is justiciable. The court makes reference to the following in the text, explicitly adopted here as its findings of fact:

(1) the list of goods and services made available by defendant state Democratic chairman to defendant DiLuglio's campaign, supra, textual paragraph accompanying notes 19 and 20;

(2) the surplus of funds in the party's checking account as of early September, supra, n. 21;

(3) defendant Reilly's statement of intention to spend checkoff funds on behalf of endorsed candidates, supra, at 1188.

This is a live, acute controversy between adverse parties. But for defense counsel's representation to this court that no funds would be spent before the court announced its Opinion, made to enable the court to reach a considered decision, it seems likely that checkoff funds would have been spent by the party on behalf of endorsed candidates before the primary. *See supra*, n. 21 and accompanying text.

For the same reasons, although the court issues this decision only a day before the primary, the court is satisfied that this controversy is not moot. In addition, the case seems to fit within the category of claimed injuries "capable of repetition, yet evading review." *See Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973).